(No. 37266.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* CASIMIR DRWAL, Plaintiff in Error.

*Opinion filed February 1, 1963.—Rehearing denied March 27, 1963.*

BELLOWS, BELLOWS & MAGIDSON, of Chicago, for plaintiff in error.

WILLIAM G. CLARK, Attorney General, of Springfield, and DANIEL P. WARD, State's Attorney, of Chicago, (FRED G. LEACH and E. MICHAEL O'BRIEN, Assistant Attorneys General, and RUDOLPH L. JANEGA and MATTHEW J. MORAN, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE HOUSE delivered the opinion of the court:

Casimir Drwal and Edward Ragen were indicted in the criminal court of Cook County for the crimes of con-

fidence game, attempted confidence game and conspiracy to commit a confidence game. A jury found Drwal guilty of attempt to commit a confidence game and both Drwal and Ragen guilty of conspiracy to commit a confidence game. Only Drwal seeks a review of his conviction.

In December, 1959, William Kaczmarek, a 16-year-old boy, was detained in the Audy Home, a juvenile home in Cook County, pending a hearing on a charge involving a stolen automobile. On Sunday December 6 the boy's father was at the home to visit him. The father and Drwal, a guard at the home, had a conversation and they arranged a meeting for the next evening at the Kaczmarek home. Between 7 and 8 o'clock in the evening of December 7, Drwal and his brother-in-law, Edward Ragen, went to the Kaczmarek home. It was agreed that the Kaczmareks would raise $250 by Friday and pay it to Drwal to help their boy. Mrs. Kaczmarek thereafter contacted their attorney and the State's Attorney's office. Friday evening a police photographer and three other policemen went to the Kaczmarek home, gave the father $250, the numbers of which had been recorded, and hid in the living room. Ragen was not with Drwal when he returned on Friday. A photograph was taken of the father giving Drwal the money and Drwal was then arrested. There is considerable conflict as to what was said and done at the Audy Home on December 6 and at the Kaczmarek home the next evening.

The father testified that his son had told him about Drwal and that when he was about to leave the Audy Home, Drwal asked him if he was going to be home the following evening. The father said he would be home and the meeting for the next evening was arranged. Drwal, on the other hand, testified that Kaczmarek approached him and said that he would like to get some help for his son and that Drwal probably knew a good lawyer who could help him. Drwal said he would look for one

and Kaczmarek then asked him to come to his house to talk about the matter.

Mrs. Kaczmarek testified that on December 7 when Drwal and Ragen came to their home, she was on the upstairs landing and could hear what was said in the living room. Drwal told the father that his son would "go up the river" because this was his second offense, that Ragen showed a sheriff's badge and said he was a sheriff from the Audy Home and that Drwal said he could tear up the son's record at the Audy Home for $300. The amount was later reduced to $250 and was to be given to Drwal on Friday. She said that she had no confidence in the men and that she later called her lawyer and the State's Attorney's office.

Drwal testified that he had Ragen drive him to the Kaczmarek home because his car was not working. He said that he agreed to get a lawyer for the boy for $250 and that Ragen did not participate in any of the conversation about the boy, a lawyer or the money.

Ragen stated he merely drove his brother-in-law to the Kaczmarek home and denied that he showed a badge to anyone or said he was a deputy sheriff.

The father testified that Ragen and Drwal said they would get someone to help his son out of trouble for $250 and that he had confidence in them. He denied that there was any conversation about getting a lawyer.

In a written statement given to the police after his arrest, Drwal said that he told the father that for $250 he would appear before the judge and vouch for the boy and that this would get him out of trouble. At the trial Drwal denied that he told the police he had represented that he would vouch for the boy and that this would get him out of trouble. He testified that he told the police that he had agreed to get a lawyer for $250 and that he would appear with the lawyer as a character witness. Robert Trinski, a police officer, testified that he took the

statement, that it contained every question asked and every answer given, that the word lawyer or attorney was never mentioned and that Drwal read the statement and then signed it.

Defendant first contends that the prosecution failed to prove him guilty of the conspiracy count beyond a reasonable doubt. This contention is based on the theory that there is nothing to show an illegal concert of action by Drwal and Ragen because Ragen was not an active participant. Although Mrs. Kaczmarek testified that Ragen showed a sheriff's badge and said he was a sheriff from the Audy Home, defendant argues that her testimony is not reliable because Mr. Kaczmarek did not testify to any participation by Ragen, because Mrs. Kaczmarek was not in a position to see Ragen show a badge, because her son was placed on probation after she had made the complaint and co-operated in the arrest, and because she waited three days and spoke to her lawyer before making the complaint.

The jury saw the witnesses, they were made aware of those matters relating to her credibility, and they chose to believe her. We do not think that the matters relied upon by defendant would justify this court in finding that the jury was unwarranted in believing her testimony concerning Ragen's active participation in the representations made to her husband.

It is next argued that the evidence fails to show beyond a reasonable doubt that defendant attempted to operate a confidence game. The evidence for the prosecution shows that Drwal represented and promised to destroy certain records at the Audy Home for $250 so that there would be no evidence of the boy's prior involvement with the law. The evidence for the defense shows that Drwal was to get a lawyer with the $250 and that he would also vouch for the boy. Here again it was the province of the jury to resolve the conflict by determining what credence to assess to the various witnesses. We will not set aside a

conviction which depends upon the credibility of the witnesses except to prevent an apparent injustice. A review of the record reveals that no such necessity appears here.

Defendant also argues that the attempt was not proved beyond a reasonable doubt because the Kaczmareks did not have confidence in him. Mrs. Kaczmarek testified that she did not have confidence in Drwal or Ragen, but her husband stated that he did have confidence in them. Defendant tries to dispel this testimony by asserting that the prosecution told Kaczmarek to testify in this manner. This accusation was made on cross-examination, denied by Kaczmarek and resolved against defendant by the jury. There is nothing in the record to indicate that he did not have confidence in Drwal when he agreed to pay the $250. We are of the opinion that there is sufficient evidence to prove beyond a reasonable doubt that Drwal attempted to operate a confidence game. See *People* v. *Rosenbaum,* 312 Ill. 330.

It is finally argued that the trial court erred in refusing to give defendant's instruction dealing with character evidence. The questionable part of the instruction is that which told the jury that such evidence is "to be considered by the jury with all the other evidence in the case, and may of itself create a reasonable doubt of the guilt of the defendant."

It is argued that under the doctrine of *Edgington* v. *United States,* 164 U.S. 361, 41 L. ed. 467, 17 S. Ct. 72, character evidence alone may create a reasonable doubt. In the *Edgington* case the trial judge had told the jurors to consider the character evidence only if the other evidence in the case created a doubt in their minds. The Supreme Court held this type of instruction erroneous and stated: "Whatever may have been said in some of the earlier cases, to the effect that evidence of the good character of the defendant is not to be considered unless the other evidence leaves the mind in doubt, the decided weight of authority now is that good character, when considered in

connection with the other evidence in the case, may generate a reasonable doubt. The circumstances may be such that an established reputation for good character, if it is relevant to the issue, would alone create a reasonable doubt, although without it, the other evidence would be convincing." 164 U.S. 361, 366, 41 L. ed. 467, 471, 17 S. Ct. 72, 73.

There is a divergence of opinion as to the purport of the *Edgington* case. Thus, in *Petersen* v. *United States,* (10th cir.) 268 F.2d 87, 88, it was noted: "The question of whether Edgington requires an instruction that character evidence alone may create a reasonable doubt or is satisfied by an instruction that the jury should consider such evidence along with all the other evidence in the case in determining guilt or innocence has produced a contrarity of opinion among the circuits. The rule that character evidence alone may create a reasonable doubt is recognized in the 7th and 10th circuits. [Citations]. The rule is rejected in the 2nd, 3rd, 4th, 5th, 6th, 8th, 9th, and D. C. circuits. [Citations]."

We have considered many of the cases interpreting the quoted language from the *Edgington* case and agree with the appraisal of that case by Mr. Justice Learned Hand as well as his general observations on this matter. "The judge's charge as to the character testimony was only that the jury should consider it along with the rest, remembering that a man with a good reputation might still commit crime; and this is challenged under the doctrine of *Edgington* v. *U.S.* 164 U.S. 361, 17 S. Ct. 72, 41 L. ed. 467. That case held no more than that a judge should not confine the use of such testimony to the event that the jury was already in doubt. There was nothing revolutionary about that, since if once they reached that point, they ought to acquit in any event. Although it is perhaps doubtful whether a jury ever in fact concern themselves with such niceties, still it was true that, if understood

at all, the charge in that case told them in substance to limit their use of the testimony improperly. But if the judge avoids that pitfall, as here he did, he has as many variants among which to choose as he has in general; evidence of good character is to be used like any other, once it gets before the jury, and the less they are told about the grounds for its admission, or what they shall do with it, the more likely they are to use it sensibly. The subject seems to gather mist which discussion serves only to thicken, and which we can scarcely hope to dissipate by anything further we can add." *Nash* v. *United States* (2nd cir.) 54 F.2d 1006, 1007. See also *Michelson* v. *United States,* 335 U.S. 469, 93 L. ed. 168, 69 S. Ct. 213.

In this case the trial judge told the jury to consider the character evidence along with all the other evidence in the case. In our opinion it was not error to refuse to tell them that the character evidence might of itself create a reasonable doubt of the guilt of the defendant.

The judgment of the criminal court of Cook County is affirmed.

*Judgment affirmed.*