People of the State of Illinois, Plaintiff-Appellee, v. Olee McElroy, Defendant-Appellant.

Gen. No. 49,866.

First District, First Division.

October 18, 1965.

James D. Montgomery, of Chicago, (Montgomery & Holt, of counsel), for appellant.

Daniel P. Ward, State's Attorney of Cook County, of Chicago, (Elmer C. Kissane and Stuart P. Shapiro, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE MURPHY delivered the opinion of the court.

After a jury trial, defendant, Olee McElroy, was found guilty of armed robbery and was sentenced to the penitentiary for a term of from three to six years. On appeal, defendant contends that the evidence was insufficient to prove him guilty beyond a reasonable doubt. Defendant also complains of (1) the refusal of the court to instruct the jury on evidence of prior good character; (2) the striking of relevant evidence relating to defendant's alibi on the ground that the same was an effort to impeach his own witness; and (3) the court's abuse of discretion in failing to give the jury an adequate opportunity to compare defendant's handwriting exhibits.

On February 29, 1964, at 5:30 p. m., three armed men entered an A & P grocery store at 5833 South Wentworth Avenue, in Chicago. There were about 20 customers in the store, of whom about eight were in the area of the four check-out counters. As the first armed man entered, a store guard, Willie Stevenson, observed him from the back as he passed swiftly through the second or third check-out aisle and proceeded toward the manager's office. Stevenson saw the man's face for five to ten seconds from a distance of about six feet. Then a second man pressed a gun at his head from the rear and said, "Don't move." As Stevenson turned to his right, he noticed a third man at the door, with a sawed-off shotgun pointed toward him and the customers in the store. Stevenson was ordered to lie on the floor by the latter two men, who took his revolver and the cash from four cash registers. He was then ordered to the rear of the store, where he remained until the men left.

A woman customer, who was standing about seven feet east of the manager's office, heard the first man say, "All right, all right." She recognized the voice and turned and looked at him. He was walking toward her, and she looked at his face first. He was looking

right at her. She also saw that he had a gun. She stood there momentarily, and then saw the defendant kick open the door to the office and heard him say, "You had better not push the alarm." She then ran to the back of the store because she thought he had recognized her.

The first man entered the manager's office and held the manager, Henry Eklund, and the bookkeeper, Marion Brunner, at gun point. He stood face to face with Eklund, about a foot apart. Eklund opened the safe at his direction, and the man emptied it of its cash contents and left. The three men were in the store from five to fifteen minutes, and when they ran out, no one pursued them or observed their flight. The woman customer then told the manager and the police that she had known the first armed man for over two years and by the name of "Boone." He was a waiter at Fred's Tavern at 1015 East 43rd Street.

On the evening of the robbery, the woman customer and Willie Stevenson, escorted by police officers, proceeded to Fred's Tavern at 1015 East 43rd Street. When the defendant came in, the customer heard him say to a bartender, "I made a piece of change today." After a given signal by her, defendant was taken into custody. The police officers searched defendant, the tavern premises and defendant's living quarters at 4413 South Ellis Avenue and found no gun or money. Neither did they find outer clothing similar to that described as worn by the defendant at the time of the robbery. Later that night defendant was placed in a "line up" at the police station and viewed by the store manager, the bookkeeper and Stevenson, the guard, and of these three who viewed the line up, Stevenson was the only one who identified the defendant.

At the trial, the State's witnesses consisted of (a) the woman customer and the private guard, both of whom identified defendant; (b) the store manager,

who was unable to identify defendant beyond stating that he "resembles the man who was in the cage"; and (c) the arresting police officer, who testified that he was present at the tavern when defendant entered, and that he heard defendant say to one of the bartenders, "I made a touch of some money," or words to that effect.

The defense witnesses included (a) the defendant; (b) a hotel clerk; (c) a police officer who interrogated defendant at the police station subsequent to his arrest; (d) defendant's employer, who testified that defendant's general reputation for truth and veracity was good; and (e) two fellow employees (bartenders), who denied hearing him say to them, "I just made me some money today," or words to that effect.

Initially, we consider defendant's contention that the evidence was insufficient to establish his guilt beyond a reasonable doubt. Defendant argues that the certainty of the identification of the two State's witnesses was diminished because (a) Eklund, the store manager, had at least five minutes to observe the man in his office and "could not identify McElroy as the robber but significantly testified that *defendant resembled the robber*. Marion Brunner viewed the lineup the next morning at 3:00 a. m. and was unable to identify defendant as the robber. The State failed to call her as a witness"; (b) the descriptions given by the woman customer, the guard and the manager differ as to defendant's appearance and clothing worn at the time of the occurrence; and (c) four or more cashiers and check-out personnel and eight customers at the check-out counters did not view the lineup and did not testify. These persons were at the front of the store facing the three armed men and had a greater opportunity for observation of the men than the woman customer and Stevenson, and "the failure of the state to call these witnesses is positive evidence for

408

the accused. So too is it evidence in favor of the accused that Eklund and Brunner did not identify defendant." Cited is People v. Kidd, 410 Ill 271, 102 NE2d 141 (1951), where the court said (p 278):

"The unfavorable circumstances under which this witness was able to view and identify Mc-Clellan must . . . be considered in the light of the testimony of the other prosecution witnesses who were unable to identify him although given a more favorable opportunity to view the perpetrators of the crime."

 As argued by the State, "Positive identification by one witness, who has ample opportunity for observation, may be sufficient to support a conviction" (People v. Mack, 25 Ill2d 416, 421, 185 NE2d 154 (1962)), and minor discrepancies in testimony do not destroy the credibility of eyewitnesses but only go to the weight to be given the testimony, and in the instant case, "these alleged discrepancies were fully brought out before the jury, whose function it was to determine the credibility of the witness." People v. Morgan, 28 Ill2d 55, 62, 190 NE2d 755 (1963).

As to identification, the woman customer testified that for a period of about a month during the two years she had known defendant, she had seen him at Fred's Tavern every night. She had gone to a hotel with him, the last time being in 1963. She further testified that she had seen him three weeks before the robbery, and at that time they were "on friendly terms as always," and "I have no doubt in my mind that the defendant is the person I saw in that A & P on that day."

Stevenson, the guard, testified in detail as to the robbery. On the evening of the robbery, he went to a tavern on 43rd Street. "Close to 9:00, if not after, I saw a person come in the tavern whom I had seen

earlier that day. . . . this gentlemen in court today. When he came in, I was sitting still and Officer Seaberry was there. Seaberry was standing behind me. I looked at him and nodded my head and he walked away. I nodded my head in a 'yes' manner." Stevenson also identified defendant in the lineup at the police station.

■ We conclude the positive identification of defendant as one of the three men who committed the robbery, by the customer and Stevenson, the guard, was based upon "ample opportunity for observation."

Defendant testified that he lived at 4413 South Ellis Avenue, about two blocks from the tavern, in a room in the basement. At about 2:00 p. m., he left home and went to Fred's 1015 Club, and he met a girl whom he had seen in the tavern two or three times. The girl's first name was Jean, and she was married. He did not know her last name or her address. They talked and drank until about 5:00 p. m., and walked to the Mercury Hotel at 800 East 44th Street. He registered at the hotel, signed a registration card, paid the clerk, Rita Wheat, $2.50, and went with Jean to room 203. He and Jean remained in the room until 9:30 p. m. He turned in his key and walked Jean to a southbound bus. He then walked to the tavern on East 43rd Street, where he changed clothes and proceeded to wait on customers. He had reported to his employment one hour late. He recognized and spoke to the A & P customer when he entered the tavern and "went about his duties as a waiter."

Rita Wheat, the assistant manager of the Mercury Hotel, testified that she registered an occupant for room 203 on February 29, 1964, at 5:02 p. m. However, she could not identify the defendant as being the person whom she registered. She also testified that the key to room 203 was returned that same evening. Defendant's exhibit 3A is a registration card, time

410

stamped at 5:02 p. m. on February 29. It was signed by one person, and it bore Rita Wheat's initials indicating that she was the registrar at that time. Defendant's exhibit 2 was a summary of the names and room numbers and rates taken from the registration cards. It was filled out by one of the room clerks then on duty and showed that room 203 was assigned to "Mr. and Mrs. Oleo."

Defendant testified that he signed the card (exhibit 3A) and attempted to write his full name, address and city. He stated he returned the key to room 203 that night and got a refund on his deposit. A jail record, on which defendant identified three signatures as his, was received in evidence to prove by comparison defendant's handwriting on the hotel registration card.

■ ■ The identification of defendant and his alibi were questions for the jury in its determination of the credibility of the witnesses and the weight to be given their testimony. From this record, we are of the opinion that there was sufficient evidence to find defendant guilty beyond a reasonable doubt.

The evidence struck by the court, which defendant claims was relevant to his alibi, was given by defendant on redirect examination and after the testimony of Police Officer Lemon Works, who had been called as a witness on behalf of defendant.

Works had testified that at the police station defendant "gave me three stories" as to his whereabouts at the time of the robbery: (1) that he was at home sleeping; (2) that he was in an automobile with friends at 43rd and Ellis; and (3) that "he did tell me that he was at the Mercury Hotel from 5:00 o'clock until he went to the tavern. . . . It was after I had given the defendant all the information then in my command as to evidence pointing to his guilt that he told me that he was at the Mercury Hotel." The officer further stated he had "checked out" all three stories, but that

he had not gone to the Mercury Hotel, but "the extent of my check of the third story was to place a telephone call."

Defendant, on redirect examination, testified, "I did not at any time tell him that between 5:00 and 6:00 I was at home sleeping. I did not at any time tell him that between 5:00 and 6:00 I was in a car with some fellows whose names, nicknames or first names I gave him, parked on the street. I did not tell him I was in a car driving on the street." At this point the court sustained the State's objection that "he is trying to impeach his own witness," and the jury was instructed to disregard defendant's statement. When defendant's counsel urged that it was not proper to strike the testimony, the court said, "Well, he may retake the stand if he wants to testify as to what he told the officer as to the time, but not in the manner of impeachment, as you have been doing." After some colloquy, defendant then rested.

■ Defendant "concedes that having called the witness Works as his own witness that he could not thereafter impeach the witness in the traditional manner of impeachment. However, the defendant was not bound by the testimony of the witness Works, and was at liberty to call witnesses who would testify differently from Works, including himself." Citations include 37 ILP, Witnesses, § 251:

> "A party has a right to contradict a witness, including his own witness, by showing the facts to be different from those testified to by the witness, but a witness may not be contradicted as to collateral, irrelevant or immaterial matters."

Also, 58 Am Jur, Witnesses, § 797:

> ". . . Indeed, were a party forbidden to contradict his own witnesses, everyone would be at the

412

mercy of his own witnesses, and if the first witness sworn should swear against him he would lose the testimony of all the rest, which would be a perversion of justice."

■ We are not persuaded that prejudicial error was committed here, although the reason given for the ruling may have been incorrect. The record shows that earlier and on his direct examination, when defendant attempted to relate his conversation with Officer Works, the State objected on the ground that "he is developing a self-serving, hearsay statement." The court ruled, "he can testify to what he told the officers," and defendant then testified at length as to what he told Officers Works and Seaberry about his visit to the Mercury Hotel, including an extended denial of participation in the robbery. In the light of the foregoing, we conclude the ruling made on defendant's redirect examination was within the court's discretion, and defendant was not prejudiced thereby.

Defendant next complains that the court committed reversible error in refusing the following instruction: "You are further instructed that proof of good character, although it does not constitute proof of innocence, may in itself be sufficient to raise a reasonable doubt where the other evidence is not of a satisfying character." Cited cases include People v. Gold, 361 Ill 23, 196 NE 729 (1935); People v. DeSuno, 354 Ill 387, 188 NE 466 (1933); and People v. Koloski, 309 Ill 468, 141 NE 163 (1923).

■ ■ We have examined the instructions given to the jury and conclude they were sufficient, considering the positive identification of defendant by two witnesses and the extent of his hotel alibi. As said in People v. Drwal, 27 Ill2d 184, 191, 188 NE2d 688 (1963):

". . . evidence of good character is to be used like any other, once it gets before the jury, and the less they are told about the grounds for its admission, or what they shall do with it, the more likely they are to use it sensibly. The subject seems to gather mist which discussion serves only to thicken, and which we can scarcely hope to dissipate by anything further we can add."

See, also, People v. Jolliff, 31 Ill2d 462, 202 NE2d 506 (1964), and People v. Bartz, 342 Ill 56, 173 NE 779 (1930), where it is said (p 67):

"Good character or reputation is but a circumstance to be considered in connection with all the evidence in determining an accused person's guilt or innocence and that is the function of the jury. If guilt is clearly established, proof of good character or reputation avails nothing."

Under the circumstances of this case, the court did not err in refusing to give the instant instruction.

 Defendant next complains that "the court abused its discretion by (1) denying the defendant's motion to permit the jury to take exhibits, received in evidence at his request, to the jury room, and (2) denying defendant's motion, at the reception of such exhibits, for leave to point out to the jurors the similarities in the handwriting on the exhibits." The record shows the exhibits were handed to the jury while in the jury box, and they were examined by the jury without instructions from the court or counsel, but the exhibits were not taken by the jury to the jury room. In People v. Allen, 17 Ill2d 55, 160 NE2d 818 (1959), it is said (p 62):

"It is well established that the matter of whether exhibits should be taken to the jury room is within the sound discretion of the trial judge and his

414

ruling will not be disturbed unless there was an abuse of such discretion to the prejudice of defendant."

See, also, People v. White, 365 Ill 499, 6 NE2d 1015 (1937), where it is said (p 513):

"In criminal cases the comparison contemplated by the statute is to be made during the reception of the evidence—not without the presence of the defendant. The jury had with it the reading glass, which they could use in comparing and examining the genuine signatures and the disputed one. The rule of evidence pronounced by the statute permits proof of handwriting by comparison, . . . but does not authorize in criminal cases the taking by the jury of standards of signatures from the bar of the court. It was reversible error to permit such exemplars to go to the jury room."

We find no error here.

█ We consider finally the court's denial of defendant's motion, at the reception of the exhibits, "for leave to point out to the jurors the similarities in the handwriting on the exhibits." As, within proper limits, this could have been done during final argument, we find no error here.

We conclude that the evidence was sufficient to establish defendant's guilt beyond a reasonable doubt, and that he received a fair trial, free from prejudicial error. The judgment of the Criminal Division of the Circuit Court of Cook County is therefore affirmed.

Affirmed.

BURMAN, P. J. and KLUCZYNSKI, J., concur.