The People of the State of Illinois, Plaintiff-Appellee, *v.* Russell Porterfield, Defendant-Appellant.

(No. 53676;

First District—February 10, 1971.

168

Gerald W. Getty, Public Defender, of Chicago, (Suzanne M. Kohut and James J. Doherty, Assistant Public Defenders, of counsel,) for appellant.

Edward V. Hanrahan, State's Attorney, of Chicago, (Elmer Kissane and Michael Scott Cisney, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE BURMAN delivered the opinion of the court:

The defendant, Russell Porterfield, was indicted on two counts of attempted murder and on two counts of aggravated battery. After a trial by jury, he was found guilty on the two counts of aggravated battery, and he was sentenced to serve an 8 to 10 year term in the Illinois State Penitentiary on each count, the terms to run concurrently.

On appeal, the defendant contends (1) that he was deprived of a fair trial because of the prosecutor's misconduct throughout the trial, (2) that the jury was inadequately instructed on his theory of self-defense, (3) that he was not proved guilty beyond a reasonable doubt, and (4) that he was deprived of a trial by a fair and impartial jury because the prosecution exercised peremptory challenges without statutory authorization. This final contention, however, was waived during oral argument, and consequently, we consider only the first three contentions.

We first summarize the evidence presented at trial. Martha Murray, one of the victims, testified that on December 30, 1966, she and her two children resided in an apartment located at 3108 West 139th Street in Robbins, Illinois. She had formerly lived with the defendant, who was

the father of one of her children. When she entered her apartment with her sister, Leola McGhee, on December 30, 1966, at about 9:00 P.M. she saw the defendant standing in her living room door. She asked what he was doing in her apartment, and he replied, "I come to kill you, mother-fucker." The defendant then shot her three times in the head, struck her on the head with the gun barrel, and broke her leg in three places with an antique lamp. Leon Mayo, her landlord then rushed into the apartment. He asked what the defendant was doing, and the defendant shot him twice. As a result of her injuries, she was hospitalized for about two weeks. Two of the three bullets were removed from her head, but the third could not be removed and was still lodged there.

Leola McGhee testified that on December 30, 1966, she had been picked up downtown by her sister, Martha Murray. When they arrived at Martha's apartment, they found the defendant inside. Martha asked what the defendant was doing there. He replied using the same curse word testified to by Martha and then shot Martha. She, Leola McGhee, did not see the gun, but she did see the blood on Martha's face after the shooting. She screamed, stood for a moment, and then ran next door to call the police. No one was at home next door, and when she returned to the apartment building, she found Martha standing on the stairs outsider the apartment. On cross-examination she testified that on December 30, 1966, she had just arrived from Alabama and that Leon Mayo and her cousin, in addition to Martha, had picked her up at the train station. Mayo drove them first to her cousin's home and then to Martha's apartment. She and Martha entered the apartment, and she saw the defendant shoot Martha. After the second shot had been fired, Mayo returned, and the defendant shot him also.

Leon Mayo, the other victim, testified that he met Martha Murray in December of 1965 when he rented an apartment to her and that he met the defendant in June or July of 1966, when the defendant moved in with Martha Murray. The defendant lived in the apartment until December 25, 1966. On December 30, 1966, he, Mayo, went with Martha Murray to pick up her sister at about the 4100 block of Indiana Avenue in Chicago. When they returned at about 9:15 P.M., they entered the building and he saw the defendant in the hallway of Martha's apartment. He then went into his aunt's apartment which was across the hall from Martha's. When he heard shots, he ran into the hall. He then heard rumbling and falling and saw Martha Murray with her face covered with blood. He asked what was wrong, and she replied, "Porterfield shot me." He then saw the defendant with a gun in his hand and hollered, "Man, what is wrong with you?" The defendant then shot him twice.

He was hospitalized for four days on account of his injuries. On cross-examination he testified that he did not have a weapon with him when he was shot, but that he did get an unloaded .22 caliber rifle after he had been wounded.

The defendant testified on his own behalf and stated that he had known Martha Murray since 1959, that the two of them had practically lived together since that time, and that he was the father of one of her children. He moved in with Martha in July of 1966 and lived continuously with her until December 30, 1966. On that date he arrived at the apartment at about 7:30 P.M., and he was admitted by Leon Mayo's son since he did not have his own key with him. He watched television for a while and then fell asleep. He woke up when he heard a car trunk slam. He looked out and saw Martha, Leola McGhee, Mayo and Mayo's wife. He had a few words with Mayo when they entered the apartment and Mayo left. Martha then asked him to go out and get a pint, and he did this. When he returned, Martha gave him a drink. He then dozed again until Martha woke him up and asked him to get some gum. He went out to get the gum, but he stopped to talk with the store owner for about 20 minutes. When he returned an argument ensued between him and Martha. They began to scuffle, Martha attacked him with a knife, and Leola struck him with a piece of iron. Martha screamed and Mayo entered with a .22 caliber rifle.

"Q. Then what happened?

A. When he entered the door I reach in my coat pocket and pulled this pistol and when I pulled the pistol Miss Murray, she dived on the pistol and I never did free the pistol from Miss Murray.

Q. What happened after that?

A. After I slammed Miss Murray on the bed and when the shots was made I couldn't guarantee where the shots came from because I never did free the gun.

Q. You never did what?

A. I never get the gun free from Miss Murray and Mr. Mayo, I shot him and he ran, he went upstairs ＊ ＊ ＊."

On cross-examination he explained that he did not have the gun with him when he arrived at the apartment at 7:30 P.M., but that he had picked up the gun when he went to the store where he worked to purchase the gum. He took the gun to prevent a possible robbery of the store and then just took the gun home. He further said that he did not shoot at Mayo. He heard shots, but "it went off through the kitchen." When asked how Martha was struck in the head with bullets he answered, "Well, it could have been from some gun, some of the rest

of them could have had a gun. I couldn't watch three peoples and tussle with them." As far as he knew Leola could have had a gun. He did not know whether Martha or Mayo had been shot.

The defendant contends initially that he was deprived of a fair trial because of the conduct of the prosecutor at the trial and during closing argument. He directs our attention to a number of specific instances of alleged misconduct. We first consider the alleged misconduct of ·the prosecutor in the closing argument.

❶ ▮ Defendant claims that he was prejudiced when the prosecutor commented during closing argument upon his common law marriage with Martha Murray, one of the victims. "How can he be so moral when he didn't take time to marry this woman who has a child by him." It is improper for a prosecutor to present arguments to a jury which do not shed light upon the issues being litigated and which have the effect of prejudicing the jury against a defendant. (*People v. Galloway,* 7 Ill.2d 527, 131 N.E.2d 474.) It is proper, however, for a prosecutor to comment upon the evidence introduced at trial and the legitimate inferences to be drawn therefrom. (*People v. Ostrand,* 35 Ill.2d 520, 221 N.E.2d 499.) In the case at bar it is undisputed that a common law marriage existed between the defendant and Martha Murray and that the defendant was the father of one of her children. Throughout the trial, the defendant attempted to raise an inference that an illicit relationship existed between Martha Murray and Leon Mayo which would justify the defendant's conduct. We believe that under the inferences suggested the prosecutor's remarks were fair comments which did not transcend the bounds of legitimate argument.

❷ ▮▮ The defendant claims that he was prejudiced when the prosecutor in closing argument explained the failure of a policeman, Officer Woolford, to testify at trial by stating, "The only thing that a police officer could testify to was that they arrested the defendant and that they took certain persons to the hospital." The defendant argues that he was denied the right to confront the witnesses whose testimony was presented to the jury. The record shows that the Court sustained a defense objection to this statement and that the Court instructed the jury to disregard all statements made by counsel not based on the evidence. The defendant himself testified that Officer Woolford came to the scene after the shooting and that he was taken to the Robbins Police Station by a police officer. Moreover, counsel for defendant attempted to infer in his closing argument that the failure of the policemen to testify was a fact which was probative of the defendant's guilt or innocence;

"Ask yourselves why didn't the police officers come up here. They were friends of Mayo's. One of them went to grammar school, I

believe, with Mayo. Why wasn't Sergeant Woolford or even Chief Stout to prove there is such a thing as the Robbins police department? They were certainly out in force that night."

It might be said that the defense counsel opened the door and invited the reply made by the prosecutor. On these facts we find that any possible prejudice created by the prosecutor's remarks was vitiated by the Court's admonition and instruction to the jury. See *People v. Underhill*, 38 Ill.2d 245, 230 N.E.2d 837.

■ 6 We next consider the alleged misconduct of the prosecutor during the course of the trial. The defendant contends that Leola McGhee was improperly rehabilitated on redirect examination after she had been impeached on cross-examination by a prior inconsistent statement made to the police. When a witness has been impeached by proof that he has made a prior inconsistent statement he may bring out the entire statement to qualify or explain the inconsistency and to rehabilitate himself. (*People v. Hicks*, 28 Ill.2d 457, 192 N.E.2d 891.) Defense counsel questioned Leola McGhee extensively concerning a statement which she had made to the police on the night of the shooting. It was proper for the prosecution to elicit those portions of that statement which was not brought out by defense counsel.

■ 7, 8 The defendant also claims that the prosecutor improperly elicited hearsay statements from Leon Mayo who testified on three occasions that when he entered the hallway after hearing shots, Martha Murray stated to him, "Porterfield shot me." A spontaneous declaration or an excited utterance is admissible as an exception to the hearsay rule (1) when an event occurs which is sufficiently startling to produce a spontaneous and unreflecting statement, (2) when there is an absence of time to fabricate, and (3) when the statement relates to the circumstances of the event. (*People v. Poland*, 22 Ill.2d 175, 174 N.E.2d 804.) Martha Murray was shot in the head, her face was covered with blood. Immediately thereafter she saw Mayo, and she made a statement. We believe that this statement was properly admitted.

The defendant claims additionally (1) that he was harrassed during cross-examination; (2) that Mayo referred in his testimony to a statement which was not in evidence; (3) that the witnesses for the State made unresponsive answers, and (4) that defense motions were not ruled upon. We have considered these and other arguments and find nothing in them which would warrant reversal.

■ The defendant's prime contention was that the prosecution failed overwhelmingly "to measure up to the required minimum standard of fairness in presenting its case." In considering this appeal we have looked at the entire record and not just at the specific instances of alleged

misconduct pointed out by the defendant. After this review we are compelled to conclude that the defendant was not deprived of a fair trial on account of the conduct of the prosecution.

 The defendant next contends that the Circuit Court failed to adequately instruct the jury on his theory of self-defense. The record, however, indicates that the defendant tendered no instructions based on this theory. The Court has no duty in a criminal case to give instruction on its own initiative concerning the defendant's theory of the case. If a defendant fails to request that an instruction be given on his theory of the facts, he cannot assert on appeal that the failure to give that instruction was error. (*People v. Carvin*, 20 Ill.2d 32, 169 N.E.2d 260; *People v. Marshall*, 96 Ill.App.2d 124, 238 N.E.2d 182.) Here the defendant made no request for an instruction on self-defense and, consequently, the failure to give an instruction was not error. The principles of *Carvin* and *Marshall* are particularly applicable here where it appears the defendant deliberately elected to refrain from giving an instruction on self-defense. The main thrust of the defense was that the defendant's gun was drawn only after Leon Mayo confronted him with a rifle and that the gun was fired accidentally while he was struggling with Martha Murray. In support of this theory the defense tendered two instructions which were given. One stated, in effect, that the defendant was guilty only if he knowingly committed the crimes and the other stated that he would be justified in the use of force if he reasonably believed such force was necessary to prevent death or bodily harm to himself. We are satisfied that the jury was adequately instructed on the law.

 Finally, it is contended, that the defendant was not proved guilty of aggravated battery beyond a reasonable doubt. We have already summarized the testimony presented at trial. The law is clear that the determination of the credibility of the witnesses and/or the weight to be given their testimony is a matter for the trier of fact and that such determination will not be disturbed, on review, unless · so unsatisfactory as to leave a reasonable doubt as to a defendant's guilt. (*People v. Hampton*, 44 Ill.2d 41, 253 N.E.2d 385.) Where the evidence is merely conflicting, a reviewing court will not substitute its judgment for that of the trier of fact. (*People v. Witt*, 122 Ill.App.2d 137, 257 N.E.2d 808.) The testimony of Martha Murray, Leola McGhee, and Leon Mayo was sufficient, if believed by the jury, to sustain the conviction.

For the reasons stated the judgment of the Circuit Court is affirmed.

Judgment affirmed.

ADESKO, P. J., and DIERINGER, J., concur.