THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* THOMAS STEWART, Defendant-Appellant.

(No. 57326; ▮▮▮▮▮▮▮▮▮▮

First District (2nd Division)—November 26, 1974.

Bloch and Rane, of Chicago (Irwin D. Bloch, Leon C. Rane, and Louis M. Leider, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Kenneth L. Gillis and Jerald A. Kessler, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LEIGHTON delivered the opinion of the court:

In a three-count indictment, Stephan Sedlacko and the defendant, Thomas Stewart, were charged with three armed robberies. Defendant alone went to trial before a jury that acquitted him of the offense charged in one count and found him guilty of those charged in two. The court sentenced him to serve concurrent terms of 2 to 8 years. He appeals to this court contending that (1) incompetency of his counsel denied him a fair trial; (2) identification of him by two victims of the crimes was vague, doubtful, and as a consequence of this and other aspects of the case, the State failed to prove him guilty beyond a reasonable doubt; (3) rulings of the trial judge that admitted evidence suggesting guilt by association, and which allowed the State to introduce rebuttal testimony, denied him a fair trial; (4) improper comments of the prosecuting attorneys in their closing arguments to the jury were prejudicial. The following are the facts that underlie these contentions.

Our Lady of the Mount Catholic Church is located at 2414 61st Avenue in the town of Cicero, Illinois. On June 25, 1970, four priests, Fathers James Flynn, George Francis Cerny, Frank Podgorny and James Skonicki, lived in the church rectory. That day, Fathers Flynn and Skonicki played golf and afterwards went to dinner. At about 10:40 P.M., Father Cerny heard a ring of the rectory doorbell. When he answered, there were two men standing outside. One was dressed like a priest; the other Father Cerny could not see but noticed that he was wearing a jacket. The one in priest's attire asked for Father Flynn, but Father Cerny said he was not in. The two men left, and, before going to bed, Father Cerny wrote a note to Father Flynn telling him that two men had come to the rectory asking for him.

At about 11:30 P.M., Fathers Flynn and Skonicki returned. Father Skonicki went to bed in his room on the third floor; Father Flynn read the message from Father Cerny. About 10 minutes later, the telephone rang. When Father Flynn answered, a male voice said it was Father Paul from Milwaukee, Wisconsin. The man told Father Flynn that he was advised to contact him because of his rapport with teenagers among whom the caller wanted to work in the Chicago area. However, the man said he had to return to Milwaukee early the next morning and therefore asked if he could come to the rectory that night. Father Flynn

agreed; and approximately a half hour later, between 12:15 and 12:30 A.M., the man arrived. He was dressed like a priest; he said he was Father Paul from Milwaukee. Father Flynn admitted him to the rectory, and for a short period, they drank some beer and talked about teenagers, social conditions, neighborhod racial changes and organizational activities within the church.

Then "Father Paul" said he had some literature in his car he thought would interest Father Flynn. He went out and promptly returned with an attache case which he put on a desk, opened and from it pulled a gun. He then ordered Father Flynn to sit down in a chair. Father Flynn did so, and a few moments later, "Father Paul" left and returned with another man who, undisguised and unmasked, stood in a doorway and looked into the room where Father Flynn was sitting. The room was illumined by light in the ceiling. Father Flynn had the opportunity to look at this second man for about 5 seconds and saw he was wearing a tan or beige colored jacket.

A short time later, Father Flynn was ordered into another room. As he walked down a hallway, he saw the second man putting a nylon stocking over his head. On this occasion, the priest could observe that man for about 5 seconds and saw that he had a gun in his possession. Within a few moments, a third man entered the rectory and armed himself with the shotgun he took from a case. The intruders then asked Father Flynn if there was anyone else in the rectory. When he told them of the other three priests, two of them went to upper floors and awoke Fathers Skonicki, Podgorny and Cerny. They were brought downstairs to the office where Father Flynn was sitting ,and the four priests were ordered to sit in chairs arranged so they each faced a wall. Then keys to their rooms and other parts of the rectory were taken from them. The intruders took watches from Fathers Flynn, Podgory and Cerny and took cash either from their persons or from their respective rooms. Later, the priests were ordered to get into two cars: Father Flynn in his with Father Podgorny; Father Skonicki in his with Father Cerny. They were ordered to leave Chicago and drive to Milwaukee, Wisconsin. However, after driving a short distance, the priests, at their first opportunity, stopped a Cicero police department squad car and told police officers about what had occurred in the rectory. Then, accompanied by the officers, the four returned to the church where they found Father Lovett, a priest from a nearby parish.

Two or three weeks later, sometime during the middle of July 1970, Father John Keenan, one of Father Flynn's classmates, brought to the rectory a copy of the May 1970 issue of a magazine, the Chicago Journalism Review. Father Keenan thought an article in the magazine, one

concerning a group called "the Legion of Justice," contained information about the men who robbed the rectory during the early morning of June 26, 1970. On one page of the publication were pictures of three men. Father Flynn and Father Skonicki looked at the three pictures and identified the one of Stephan Sedlacko as the "Father Paul" and that of the defendant, Thomas Stewart, as the second man who came into the rectory and was observed twice for about 5 seconds, once at the doorway of the office and once in the hallway, armed with a gun and putting a nylon stocking over his head. Having made this identification, the priests, accompanied by two trustees from the church, went the next day to the Cicero police department and showed the pictures to investigating officers who were assigned to the case. A short time later, Father Flynn was shown a group of 20 photographs from which he picked out a picture of the defendant, Thomas Stewart. Defendant was later arrested, the three-count indictment against him and Sedlacko was returned, and on October 6, 1971, represented by private counsel employed by him, he went to trial before a jury.

Between the robberies and the trial, Father Podgorny passed away. Therefore, the three surviving priests weer the witnesses for the prosecution. Father Flynn was the first to testify. He told the jury of his experiences on the evening of June 25 and the early morning of June 26, 1970: how he saw the man dressed in priest's garb; how he saw the second man, observed him twice for intervals of 5 seconds, and later was able to identify him along with "Father Paul" by looking at pictures in a copy of the Chicago Journalism Review; and, after that, picking out a picture of defendant from among 20 shown him by Cicero policemen. Over defense objections, Father Flynn was permitted to tell the jury how he learned the name of Stephan Sedlacko, and how, on the occasion of the robberies, defendant and Sedlacko were together in the rectory and acted in concert with one another.

Father Skonicki was the second witness.[1] He also described to the jury his experiences of the evening and early morning hours in question. He said he was awakened in his room by two intruders, armed with guns, who brought him and Father Podgorny to an office on the first floor of the rectory where Fathers Flynn and Cerny were seated in chairs heads down and facing a wall. Corroborating Father Flynn's testimony in large part, he told the jury how, during a period that followed, the intruders threatened him and his fellow priests with death by shooting; how de-

---

[1] Also, between the robberies and the trial, Father James Skonicki left the priesthood and married a nun. This fact was disclosed to the jury in his direct examination. However, in this opinion, we will refer to him as Father Skonicki, his religious status at the time of the crimes.

mands were made for the safe combination and keys; how, in connection with a demand concerning the signing of checks, Father Podgorny was hit in the face by one of the intruders. Father Skonicki said that as he was driving his car out of the garage, as he was ordered to do, he had a 5-second opportunity to look at one of the intruders. Then, the priest was asked if he saw anyone in court who was the same person. Father Skonicki looked and then told the jury that defendant "[a]ppears to be the same person."

Father Cerny was the third and last witness for the prosecution. He described his experiences, telling the jury how he answered the doorbell of the rectory on the night of June 25 and seeing the two men, one dressed in a priest's garb inquiring about his fellow priest. He told the jury how he left the message for Father Flynn and went to bed. He, like Father Skonicki, described how he was awakened by two intruders armed with guns who ordered him from his bedroom to the first-floor office where Father Flynn was sitting.

Defendant's defense was an alibi. In support of it, he called his father, an older brother and two sisters. They testified that during the evening and early morning hours of June 25-26, 1970, defendant was at home, 1411 North Linder in Chicago. Then they were cross-examined. Three of them, the father, the brother and the older sister, denied ever hearing of defendant having an acquaintance or friend named either Stephan or Stephan Sedlacko. The father was asked if he knew all of defendant's acquaintances. He said he did. Then, he insisted that he had never heard of a Stephan Sedlacko nor had he ever received a telephone call for defendant by a person of that name. Defendant rested his case with the testimony of his alibi witnesses.

Thereafter, over his objections, the court allowed the State to call a Chicago policeman who told the jury that he was a member of his police department's Subversive Section, Intelligence Division. He testified that on March 11, 1970, he was near the Palacio Theater in Chicago and there saw defendant and Stephan Sedlacko together. On that occasion, a photograph, marked as a prosecution exhibit, was taken showing defendant and Sedlacko near each other. Testimony of this rebuttal witness concluded presentation of the evidence. After this, the jury heard argument of counsel for the parties, received its instructions, deliberated and returned its verdicts on which the court entered judgment. We now turn to defendant's contention concerning competency of his counsel because in our opinion it has a bearing on the others he makes in this appeal.

Defendant calls our attention to specific instances which, he insists, show that he was not given effective representation at his trial. 1. His

counsel did not object when the trial judge read the indictment to the jury. This reading, according to defendant, disclosed that Stephan Sedlacko, who was not on trial, was a codefendant. Disclosure of this fact, defendant argues, permitted the State to prove him guilty because of his alleged association with Sedlacko. 2. Counsel failed to request that witnesses be excluded from the courtroom before the prosecuting attorney made his opening statement to the jury. 3. He did not make a pretrial motion to suppress identification evidence, a request which perhaps would have been granted by the trial court. 4. Counsel failed to request copies of police reports and transcripts of the preliminary hearing. 5. He failed to tender, for the trial court's consideration, any defense instruction. 6. Counsel failed to exploit the absence of a face-to-face confrontation between defendant and the priests after his arrest. 7. He failed to interpose timely and appropriate limiting objections to questions asked the priests when they testified for the State. 8. Counsel failed to interpose timely and appropriate objections to improper comments in the closing arguments made by the prosecuting attorneys in their summations to the jury.

■■ The competence of defendant's counsel in the proceedings we review must be decided solely on the record of this case. (*People v. Williams*, 26 Ill.2d 190, 196, 186 N.E.2d 353.) And before we can conclude that this was a case of inadequate representation, defendant must show not only actual incompetence of his counsel, as reflected by the manner in which the lawyer discharged his duties as a trial attorney; he must show that he was substantially prejudiced by the conduct of his counsel, without which the outcome of his trial would probably have been different. (*People v. Bliss*, 44 Ill.2d 363, 255 N.E.2d 405.) It is with these principles in mind that we examine the record in order to determine whether the specific instances to which our attention has been called support defendant's claim of incompetence of counsel at his trial.

■■ To begin with, defendant's counsel could not object when the trial judge read the indictment to the jury. (See *United States v. Press* (2d Cir. 1964), 336 F.2d 1003, 1016.) Reading the indictment complies with the requirement of Supreme Court Rule 234 that "[t]he judge shall initiate the *voir dire* examination of jurors by identifying the parties and their respective counsel and briefly outlining the nature of the case." (Ill. Rev. Stat. 1971, ch. 110A, par. 234; see 23 C.J.S. *Criminal Law* §962 (1961).) A lawyer should not be criticized for failing to make an objection which would have ben unavailing. (*People v. Johnson*, 45 Ill.2d 501, 259 N.E.2d 796.) Further, it appears that, contrary to defendant's assertion, his counsel did not fail to request the court's exclusion of witnesses before the State's opening argument. The record shows that as

trial before the jury was about to begin, an attorney for the State made a motion to exclude witnesses. Defendant's counsel joined in the motion, saying, "I was going to say the same thing, of course." Thereafter, the jury was brought into the courtroom and the opening statement for the prosecution was made.

■■■ Recently, when we had occasion to decide a contention similar to the one defendant makes concerning competency of his counsel, we said that "[f]ailure of a lawyer to make a motion, to object to improper testimony during a trial, or to object to portions of a prosecutor's final argument, does not establish lack of competent representation." (*People v. Walker*, 22 Ill.App.3d 711, 318 N.E.2d 111.) Usually, the decision of a trial lawyer not to make a motion to interpose an objection, the kind of things about which defendant complains in this appeal, are matters of trial strategy, not evidence of incompetency of counsel. (*People v. Rettig*, 131 Ill.App.2d 687, 264 N.E.2d 835.) Nor was it of significance that counsel failed to tender any defense instructions; those submitted by the State covered the case. Therefore, we conclude that defendant was not denied a fair trial because his counsel was incompetent. *People v. Georgev*, 38 Ill.2d 165, 230 N.E.2d 851; *People v. Laffiton*, 62 Ill.App.2d 440, 211 N.E.2d 15.

■■ In his brief and argument before us, defendant concedes that during the early morning hours of June 26, 1970, four priests were robbed in the rectory of Our Lady of the Mount Church in Cicero, Illinois. This concession is unavoidable; the uncontradicted testimony of the priests vividly told the jury how they were terrorized by three intruders, each armed with a gun, and how personal property, including cash, was taken either from their person or from the premises in which they lived. Thus, the State proved the armed robberies charged in Counts 1 and 2 of the indictment. (See *People v. Jones*, 53 Ill.2d 460, 292 N.E.2d 361.) The remaining question, one which the State was obliged to prove beyond a reasonable doubt, was whether the defendant, acting either alone or in concert with others, committed those offenses. (*People v. Berne*, 384 Ill. 334, 51 N.E.2d 578.) And in determining the issues of identity and concert of action, it was within the province of the jury to consider all the facts and circumstances of the case and decide whether defendant was one of the robbers and whether the group that invaded the rectory the morning in question did so with a common purpose to rob the priests. (*People v. Hubbard*, 55 Ill.2d 142, 302 N.E.2d 609.) These were issues of fact for the jury, and its determination will be set aside by this court only where the evidence is so unsatisfactory as to leave a reasonable doubt of defendant's guilt. (*People v. Glover*, 49 Ill.2d 78, 84,

273 N.E.2d 367; *People v. Lewis*, 18 Ill.App.3d 281, 309, N.E.2d 784.) In this case, whether the evidence that convicted defendant is so unsatisfactory that it leaves a reasonable doubt of his guilt depends on the testimony of Fathers Flynn and Skonicki, weighed against that of the four alibi witnesses.

Father Flynn testified that on the morning of the robberies, in 5-second durations, he saw defendant twice in the rectory, on one occasion armed with a gun. The priest told the jury he saw defendant with the other two intruders, acting in concert with them. Later, Father Flynn said he first identified defendant's picture in an issue of a magazine sent to him by a classmate. Then, he went to the Cicero police station where they later showed him 20 photographs from which he picked out one of the defendants. In court, Father Flynn was positive that defendant was one of the robbers. Father Skonicki supported Father Flynn's testimony when he told the jury that as he was driving out of his garage in obedience to the orders of the robbers, he saw one of them and observed him for about 5 seconds. He said defendant appeared to be that person.

■■ Against this testimony, defendant's four alibi witnesses testified that on the occasion in question he was in his home in bed. From its verdicts, however, it appears that the jury disbelieved these defense witnesses. This fact is unavailing to defendant as error in this appeal because it was within the province of the jury to choose whom it would believe or disbelieve. (*People v. Hyde*, 1 Ill.App.2d 831, 275 N.E.2d 239.) And contrary to defendant's contention, as shown by the jury's verdicts, Father Flynn's identification testimony was not vague, doubtful or uncertain. In fact, he was positive and insistent that defendant was one of the three robbers who came to the rectory of Our Lady of the Mount Church on the occasion in question. Therefore, the State's identification evidence was not doubtful and unclear, notwithstanding that Father Skonicki, one of the witnesses, was not certain that defendant was one of the robbers. (See *People v. Preston*, 88 Ill.App.2d 107, 231 N.E.2d 704 (abstract opinion); compare *People v. Waters*, 2 Ill.App.3d 429, 275 N.E.2d 472; *People v. Rodgers*, 3 Ill.App.3d 85, 279 N.E.2d 72.) We conclude that defendant's identification by the two victims of the crimes was not vague or doubtful and that the evidence heard by the jury proved him guilty beyond a reasonable doubt. (*People v. Bates*, 9 Ill.App.3d 882, 293 N.E.2d 358; *People v. McElroy*, 63 Ill.App.2d 403, 211 N.E.2d 444.) This conclusion brings us to consideration of defendant's remaining contentions which, if sound, would require reversal of his conviction and remandment of the cause for a new trial. The most serious of these is the contention that the trial judge erred in making

rulings that admitted evidence suggesting defendant's guilt by association with Sedlacko, the absent codefendant, and which allowed the State to introduce the rebuttal testimony of the Chicago policeman.

■■ We must reject this contention. Defendant and Sedlacko were jointly indicted. It was the State's theory that in the robberies, Sedlacko and defendant, aided and abetted by a third person, went to the rectory of Our Lady of the Mount Church and there, acting in concert, committed the crimes for which defendant, alone, was on trial. The testimony of the three priests proved a conspiracy to commit the robberies. The law is settled that once conspiratorial conduct is proved, concert of action established, the acts and declarations of an alleged conspirator are admissible against a coconspirator, even though a conspiracy is not charged and not all of the conspirators are indicted or on trial. (See *People v. Parson*, 27 Ill.2d 263, 189 N.E.2d 311; *People v. Niemoth*, 409 Ill. 111, 98 N.E.2d 733; *People v. Trigg*, 97 Ill.App.2d 261, 240 N.E.2d 130; 22A C.J.S. *Criminal Law* §§ 754-756 (1961).) Therefore, no right of the defendant was infringed by the trial court rulings that admitted evidence which showed the jury his association with Sedlacko at the time of the crimes charged in the indictment.

■■ The ruling that allowed the State to introduce the rebuttal testimony of the Chicago policeman was also correct. Cross-examination of defendant's alibi witnesses elicited from three of them the testimony that defendant did not have a friend or acquaintance named either Stephan or Stephan Sedlacko. It is the rule that testimony elicited on cross-examination, that which is within the scope of the direct examination, is testimony for the party calling the witness, and not for the party cross-examining. (See *Sullivan v. Coca Cola Bottling Co. of Chicago*, 313 Ill.App. 517, 40 N.E.2d 579; 98 C.J.S. *Witnesses* § 375 (1957.) In the instance before us, defendant offered the testimony of his alibi witnesses to prove that he was not with Sedlacko when the robberies were committed. Cross-examination which touched on his acquaintance with Sedlacko was within the scope of the direct inquiry. This being so, the State could rebut the testimony elicited from defendant's alibi witnesses when they were cross-examined. Compare *People v. Kirkwood*, 17 Ill.2d 23, 160 N.E.2d 766; *People v. Terczak*, 96 Ill.App.2d 373, 238 N.E.2d 626.

The remaining contention concerns certain comments which the prosecuting attorneys made in their closing arguments to the jury, comments which defendant argues were prejudicial to his rights to a fair trial. For example, it is complained that the first attorney who addressed the jury for the State closed his summation by calling attention to the testimony

of the three priests, saying that "* * * [t]hey have a right to practice their religion in their parish any way they see fit. * * * We have a right to freedom of religion. Consider that right also if you would." Thereafter, defendant's counsel made his argument to the jury. And in the course of it, he referred to the fact that the prosecution did not call any Cicero policeman as a witness, nor did the State produce any fingerprints, physical evidence or recovered proceeds of the robberies.

Then, in what is conceded was an attempt to respond to this defense argument, the assistant State's Attorney who closed for the State commented, "* * * we hear in every single case * * * [the] talk about police officers. Why weren't they called?" Answering the question, he told the jury that the names of Cicero policemen were on the prosecutor's list of witnesses; however, none was called because their testimony concerning the conversation any of them had with the priests the morning of the robberies would have been hearsay and inadmissible. The assistant State's Attorney said that with regard to the proceeds of the robberies, the State did not claim that any were recovered. As a matter of fact, he said that the defendant was not arrested until September, 1970. Following this comment, the assistant State's Attorney went on to observe that defense counsel had talked with Cicero policemen; therefore, he could have subpoenaed them had he so desired. The defense, he said, had the right of subpoena possessed by the State. Finally, commenting generally on what defense counsel had said, the prosecuting attorney told the jury, "That's sand. That's the old cloud of dust as Mr. Stewart happily walks out of the courtroom. If the sand gets into the jury's eyes—."

■■ It is the rule that whether language used by a prosecuting attorney in arguing to a jury will cause reversal of a conviction depends on the facts of the particular case before us. (See *People v. Baker*, 365 Ill. 328, 334, 6 N.E.2d 665.) Therefore, looking at this case, we observe that when the priests testified, they attributed to the robbers language which suggested an attempt to oppress them because of their religious philosophy and their beliefs concerning the administration and social role of Catholic churches. In fact, some of this testimony was elicited by defense counsel during cross-examination, and its significance was acknowledged in his final argument. It appears, then, that in making his summation, the assistant State's Attorney, even though crudely and indeed impolitely, was commenting on the evidence. This was proper. A prosecutor can comment on the evidence introduced in a trial and on all the legitimate inferences which can be drawn from it. (*People v. Porterfield*, 131 Ill.App.2d 167, 268 N.E.2d 537.) The argument of a prosecuting at-

torney which is not expressed with the nicety of polite conversation is not ground for reversal when the facts justify what is said. See *People v. Shack*, 396 Ill. 285, 71 N.E.2d 633.

■■■■ With regard to the other comments of the assistant State's Attorney, it appears they were responses to the argument of defense counsel. Therefore, a case of prejudicial final argument cannot be made merely because what was said in retaliation was more intense than meets with defendant's approval. Not every ill-advised statement in a closing argument will warrant reversal of a conviction. (*People v. Phillips*, 126 Ill.App.2d 179, 261 N.E.2d 469; *People v. Turner*, 82 Ill.App.2d 10, 226 N.E.2d 667.) Nor will remarks of counsel in final argument, even though improper, constitute reversible error unless they result in substantial prejudice to a defendant. (*People v. Nilsson*, 44 Ill.2d 244, 255 N.E.2d 432; *People v. Smith*, 20 Ill.App.3d 756, 314 N.E.2d 543.) Defendant does not show us how he was prejudiced by the comments about which he complains. The judgment is affirmed.

Affirmed.

STAMOS and DOWNING, JJ., concur.