**People of the State of Illinois, Plaintiff-Appellee, v. W. Q. Thompson, Defendant-Appellant.**

**Gen. No. 50,815.**

First District, Fourth Division.

January 8, 1968.

W. Q. Thompson, pro se, of Chicago, appellant.

John J. Stamos, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Oliver D. Ferguson, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE DRUCKER delivered the opinion of the court.

Defendant pro se appeals from a judgment of conviction of rape after a jury trial and from a sentence of four to six years in the penitentiary.

On April 29, 1966, defendant instructed the Public Defender, who had been appointed by the trial court to represent him on appeal, to withdraw and requested our court to appoint other counsel. Thereafter we appointed other counsel and on August 14, 1966, defendant requested that this counsel withdraw. On August 24, 1966, we allowed his second attorney to withdraw and granted defendant pro se additional time to file briefs and an abstract. On May 10, 1967, we granted defendant leave to file his briefs and excused the filing of an abstract.

Defendant's capable briefs raise the following points on appeal:

1. His attorney's incompetent conduct of the trial amounted to denial of his right to counsel and a deprivation of due process;

2. The court's coaching of the prosecutrix at the preliminary hearing and at the trial deprived defendant of due process;

3. There was no evidence of force or resistance;

4. The evidence was not sufficient to establish guilt beyond a reasonable doubt.

**The Evidence**

The evidence showed that on November 1, 1964, defendant left his work at three o'clock in the morning and arrived at 4249 West 21st Street at 3:30 a. m. Prosecutrix and her husband, Sylvester Davis, resided in the second floor rear apartment. Mr. Davis' sister, Annie Brown, lived with her husband in the second floor front apartment. Mr. Davis' parents lived in the first floor apartment and another sister, Mrs. Ella Davis, as well as some unidentified relatives lived in the two apartments on the third floor. Mr. Davis operated a twenty-four hour livery service in the basement in which defendant had previously been employed.

Prosecutrix's sisters-in-law, Mrs. Ella Davis and Mrs. Annie Brown, both testified that as they arrived home from a party at three forty-five in the morning,* they met defendant on the second floor of the building; that they asked him what he was doing there and he replied that he had come to visit them; that they both stated that it was strange that he should choose such an hour to pay them his first visit.

The prosecutrix testified that she was first awakened between three and four that morning by someone knocking at her back door; that she went into the dining room and, without opening the door, called out to find out who it was and what they wanted; that she was told it was W. Q. and that he wanted to see her husband and that she told him to look in the livery service; that one-half hour later she found defendant standing over her bed and that he told her: "If you don't shut your mouth, I'll kill you!" Her testimony continued:

> "I asked him what was he doing in my bedroom, and by that time he had put his hand over my mouth and was jumping in the bed with me and had me down like this and pried my legs open and put his penis into my vagina and made me have an intercourse with him.
>
> "Q. Now, did you make any scream or any outcry?
> "A. No. He had his hand over my mouth with one hand and he had me down with the other hand.
> "Q. All right. Now, do you know at this time whether or not the defendant completed the act of intercourse?
> "A. No, he didn't. He act like he was afraid. He jumped up and run out the back door.

---

* Mrs. Davis testified that it might have been as late as four o'clock.

"Q. Now, while he was in there, ma'am, was there any conversation between you and the defendant?

"A. He told me if I told my husband, he was going to kill me. If I call the police, he was going to kill me.

"Q. Now what if anything did you do while the defendant was having intercourse with you?

"A. I was trying to get away from him."

She also testified that she told the defendant that her husband would kill him if he found out and that the whole incident took no more than five minutes. The prosecutrix also stated that a bathroom light next door was on all night and shone right through her bedroom window, partially illuminating the room and that she had known defendant as a driver of a cab for her husband's livery service for about a year. After defendant left, prosecutrix went upstairs to her sisters-in-law's apartment still dressed in her nightgown and crying hysterically, saying that she had been raped. Thereafter her husband and then the police were called. The police arrived at seven-thirty and found that a piece of plasterboard, used as a patch on the back door, was broken away six to eight inches from the door knob. They took prosecutrix to the hospital where she was found to have no cuts or bruises and a smear from her vagina showed no deposits of sperm.

Prosecutrix's husband testified that he found a cap similar in size, shape, weight and color to the cap defendant wore on that evening in prosecutrix's bed and both Mrs. Annie Brown and Mrs. Ella Davis testified that this cap was similar in size, shape, weight and color to the cap defendant wore.

Defendant testified that he wanted to use the livery service's phone and at about three-thirty in the morning he found Mr. Davis sleeping in the livery service, woke

him up and asked to use the phone. Mr. Davis told defendant that the phone was locked up and he couldn't unlock it and defendant left the livery service. Defendant admitted his confrontation with Annie Brown and Ella Davis and stated that we went from there to the basement and left directly from the livery service, arriving home at three forty-five. He denied that he raped the prosecutrix.

Officer Miller testified that the arrest was made at defendant's home early on the morning of November 1; that the police opened the door a crack and announced themselves; that defendant then ran across the room and was found hiding in a closet. On cross-examination Miller testified that he saw "a reddish mark on her [prosecutrix's] throat."

### Opinion

█ Defendant first contends that the incompetence of his lawyer deprived him of his right to counsel under both the State and Federal Constitutions. The general rule is well stated in People v. Morris, 3 Ill2d 437, 121 NE2d 810, cited by defendant. At page 449 the court said:

> ". . . the defendant must clearly establish: (1) actual incompetency of counsel, as reflected by the manner of carrying out his duties as a trial attorney; and (2) substantial prejudice resulting therefrom, without which the outcome would probably have been different."

██ Defendant points to two incidents of incompetent conduct. First he claims his counsel should have objected to the admission of the cap into evidence, with the flat assertion that it was incompetent evidence. Upon its offer into evidence, the cap was identified by prosecutrix's husband as the cap he found in her bed and

39

similar in size, shape, weight and color to the cap worn by defendant. Since a proper foundation was laid, failure of defendant's counsel to object to the cap's admission into evidence could not be characterized as incompetence. Defendant's next point is that he informed his attorney that the prosecutrix was a former mental patient and that his attorney failed to properly investigate and bring this to the attention of the court. Since no basis for this alleged error is found in the record, we cannot determine whether it is well taken. (People v. Lantz, 387 Ill 72, 55 NE2d 78.)

 Defendant also contends that the court coached the prosecutrix in violation of his due process rights. At the preliminary hearing the court asked a few questions and at the trial the court also asked a question which was unanswered. The court's questions were within the bounds of permissible inquiry. (People v. Smith, 18 Ill2d 547, 553, 165 NE2d 333.)

 Defendant thirdly contends that there was no evidence that the alleged act occurred by force or against the prosecutrix's will.

In People v. Elder, 25 Ill2d 612, 186 NE2d 27, the court said at page 614:

> "Although there is no fixed rule as to the degree of force required, there must be satisfactory evidence that there was such actual force . . . or threat of force that the victim's will to resist was overcome." (Cases omitted.)

Defendant argues that the absence of bruises and marks on the prosecutrix's body and her failure to scream show an absence of force. The prosecutrix in the instant case was surprised by the intruder, she was clad only in a nightgown and was lying in bed in a drowsy state at about 4:30 a. m. In this situation the threat of death in conjunction with defendant's jumping on top of the prosecutrix without waiting to remove his clothes, cover-

40

■■■■■■■■■■■

ing her mouth with one hand and prying her legs open with the other is sufficient force to sustain a conviction of forcible rape. Further, Officer Miller testified to seeing a reddish mark on her throat.

■ ■ Defendant's final contention is that his guilt was not proved beyond a reasonable doubt, arguing principally that the uncorroborated testimony of the prosecutrix is insufficient to convict. Corroboration of the prosecutrix's testimony is not an unvarying requirement in a rape case but depends instead on the evidence in each particular case. In People v. Mack, 25 Ill2d 416, 185 NE2d 154, the court discussed this requirement saying at page 420:

> "We do not, however, regard these cases as establishing an inflexible rule of law requiring in all cases that the testimony of the complaining witness in a rape case must be corroborated. Indeed, we have frequently stated that corroboration is *not necessary where* the testimony of the complaining witness is *clear and convincing.* . . . The unvarying rule of law is that in a rape case, as in any criminal case, the evidence must be sufficient to establish the guilt of the defendant beyond a reasonable doubt. Where we have reversed cases because of failure to corroborate the testimony of the complaining witness, we have done so not because of any fixed rule requiring corroboration but because, upon the state of the record in the particular case, the evidence left a reasonable doubt as to the guilt of the defendant." (Cases omitted; emphasis supplied.)

Although the story told by the prosecutrix would seem to be clear and convincing and require no corroboration, in fact there was corroboration. The evidence showed that immediately subsequent to the alleged act, the prosecutrix went to her sisters-in-law's apartment crying hysterically that she had been raped. Immediate complaint has been

41

held corroborative of the victim's testimony. People v. Jenkins, 24 Ill2d 208, 181 NE2d 79; People v. Finley, 22 Ill2d 525, 177 NE2d 149. The finding of defendant's cap in the prosecutrix's bed, the broken plasterboard patch in the back door and the defendant's hiding from the police are further corroboration of prosecutrix's story. The language of the opinion in People v. Elder, supra, is peculiarly applicable in the instant case, at page 614:

> "Her testimony was corroborated by the persons to whom she complained, by the finding of the cap in the vacant lot, and by defendant's presence near the scene. Where the evidence is conflicting, the credibility of the witnesses is for the determination of the jury. (People v. Walden, 21 Ill2d 164.) In our opinion the jury was warranted in finding that the defendant's guilt was established beyond a reasonable doubt."

The judgment is affirmed.

Affirmed.

McCORMICK, P. J. and ENGLISH, J., concur.