THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* CHARLES WHITE, JR., Defendant-Appellant.

(No. 55407;

First District (2nd Division)—December 11, 1973.

Gerald W. Getty, Public Defender, of Chicago (Elliot M. Samuels, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Elmer C. Kissane and Robert J. Cohen, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE HAYES delivered the opinion of the court:

On 19 August 1968, Charles White, Junior, defendant-appellant (hereafter defendant), was indicted by the Cook County Grand Jury, under general number 68-3038, for the murder of Cedrick Gayles, his cousin, and the rape of and aggravated battery on Harriet Gayles, his aunt. Defendant pleaded not guilty. On 11 December 1969, after a jury trial, defendant was found not guilty of the murder, but guilty of the rape and of the aggravated battery. He was sentenced to a term of from fifteen years to forty-five for the rape. Although there was a finding of guilty on the aggravated battery, the trial judge did not sentence the defendant on that charge, since he felt that it arose from the same transaction as the rape. This is defendant's appeal from those convictions and that sentence.

Harriet Gayles, the victim, testified that on 5 August 1968 she was alone in her apartment at 7100 S. Stewart Avenue in Chicago with her infant daughter and her three-year-old son, Cedrick. Her other children had gone swimming, and her husband was at work. It was early in the evening and she was watching television when Charles White, Junior, her nephew and the defendant, arrived to retrieve some clothes which he had left the day before when he had gone on a picnic with her family and had stayed overnight. The witness stated that she offered the defendant some juice which was in the refrigerator. He walked to the kitchen, followed by her son, Cedrick. Defendant returned from the kitchen as Mrs. Gayles got up to bring some fruit to the kitchen. At this juncture, defendant jumped her, struck her with something in the neck, and

threatened to kill her if she screamed. He then shoved her into the bedroom with a knife and forced her to undress. Defendant stabbed the witness between her breasts and attempted to have intercourse with her. He inserted his penis into her vagina but was apparently unable to complete the act of intercourse by achieving an ejaculation. The defendant then forced Mrs. Gayles into the hallway and again stabbed her in the chest. During the whole episode the defendant continually threatened to kill Mrs. Gayles. He forced her to sit on a couch, in the hallway, and, as he walked a few feet away, the witness stated that she ran for the back door. As she attempted to open the door, the defendant stabbed her in the arm and in the face. She was, however, able to open the door enough to allow her dog, a Doberman pinscher which had been locked out on the back porch, to get in. On her command the dog jumped defendant who then ran out the front door. Mrs. Gayles stated that she ran out the back door to a neighbor's apartment. She stated that she never saw her son Cedrick after he followed defendant into the kitchen when defendant went to get the juice. Cedrick was, in fact, found dead in the pantry off the kitchen with a rag stuffed in his mouth.

Mrs. Gayles stated that she did not remember a conversation with her sister, defendant's mother, in which she asked her sister if she would allow defendant to come and live with her and take care of the children so that she could go back to school.

Officer Ronald Crawford, a Chicago police officer, testified that he arrived at 7100 S. Stewart Avenue at 8:40 P.M. on 5 August 1968. He went to the apartment of a Mrs. Cole, a neighbor of Mrs. Gayles. There he observed Mrs. Gayles on the floor, bleeding from the face, chest, neck, and arms. He tried to enter her apartment but was initially prevented from doing so by a Doberman pinscher. Officer Crawford was finally able to gain entrance with the help of an unknown child who came up from the street and removed the dog. Inside the apartment Officer Crawford noticed what appeared to be, and what were later stipulated to be, bloodstains on a couch in the front hall and on the rear door of the apartment and the wall around it. He observed a small boy lying in the pantry with a rag protruding from his mouth.

Detective Gerald Slattery, a Chicago police officer, testified that he arrived at 7100 S. Stewart Avenue at 8:40 P.M. on 5 August 1968. He proceeded to Mrs. Gayles' apartment and met Officer Crawford who was already on the scene. The witness testified that he observed bloodstains on a couch and on the floor leading into the kitchen. He also observed blood on the mattress in the bedroom and on the bedroom floor. The witness stated that he too observed the lifeless body of Cedrick Gayles with a towel stuffed in his mouth. Detective Slattery did not see Mrs.

Gayles at the scene of the incident, but did interview her later that evening in St. Bernard's hospital. At that time he observed wounds on the victim's arms and face; other apparent wounds were not visible since they had already been treated and covered. Officer Slattery stated that he went looking for defendant in various places in the company of defendant's father and defendant's cousin (an older son of Harriet Gayles). One of these locations was a Gulf Gas Station at which defendant was employed.

De'Armond Carter, a Chicago police officer, testified that, while on patrol in Chicago's Jackson Park on 7 August 1968 at approximately 1:30 A.M., he observed defendant sleeping on the ground. He and his partner, Bernard Ward, warned defendant that the park was closed and told him to leave. Later that same morning at approximately 3:45 A.M., Officer Carter observed defendant sleeping at another location in the park. Officer Carter stated that he told defendant to go home, but defendant responded that he was going to go to a filling station. The officers then drove defendant to a Gulf Gas Station at 64th Street and Stony Island Avenue. Apparently after a conversation with the attendant at the Gulf Station, Officer Carter and his partner placed defendant under arrest. A search of defendant's person revealed a black-handled pocket knife.

Although the knife was not available at the trial (since it had been inadvertently destroyed), Marian Caporusso, a microanalyst for the Chicago police department, testified that she had examined it. She described the instrument and stated that she had found blood on the blades, but was not able to say whether it was human blood since the knife did not present an adequate sample.

Juanita White, defendant's mother, and the victim's sister, testified on her son's behalf. She stated that defendant stayed at her sister's house on the night of 4 August 1968 after a family picnic. On 5 August, he returned home from work at approximately 5:10 P.M. Mrs. White stated that her son then told her that he was going to go over to her sister's house that evening. Initially, she told him that he could not go, but relented when he stated that he was going there in order to retrieve some belongings he left there after the picnic the day before. The witness stated that she told her son, however, that she felt that he was going there too much, and, in the future, his visits would be limited to the weekends. She stated that he was working during the week and she wanted him to stay home at night. Mrs. White stated that her son returned home at approximately 9:00 P.M. that evening and went to the store for her. She did not notice any blood on him or on his clothes.

After his return from the store, he took his radio and went out. He did not sleep at home that night.

Mrs. White stated that her sister's husband was not living with her sister. On 29 or 30 July 1968, her sister had asked Mrs. White if defendant could come and live at the sister's house in order to take care of her children so she could go back to school. Mrs. White stated that she had refused her sister's request.

Defendant testified in his own behalf. He stated that he went to his aunt's house on 5 August 1968 to retrieve some belongings he had left there the day before. He and his aunt had a conversation while they watched television and drank some juice. He asked his aunt if she wanted to "have sex" with him. He testified that they had had relations on two previous occasions. Defendant stated that his aunt was hesitant at first because she had just had relations with her husband and because she was afraid somebody might come in. After they had undressed, she dropped a cigarette on defendant. She told him it was an accident and started to laugh. According to defendant, as he then attempted to get up, she pulled him back down and he hit her. As he attempted to put on his clothes, Mrs. Gayles went to the kitchen, returning with a broom. She swung at him with the broom; he grabbed it from her and struck her with it, knocking her down. She returned to the kitchen. Defendant stated that he had gotten dressed and was going out the door when his aunt attacked him with a steak knife, cutting him on the lip. At this juncture, defendant admitted that he pulled his own pocket knife and stabbed his aunt "I don't know how many times." As she fell to the couch, he hit her with his fist. She ran to the back door and he exited through the front door.

Defendant stated that he then returned home, went to the store for his mother, and spent the night at a friend's house. The next day he purchased some new clothes and put the clothes that he had worn to his aunt's house in a locker because he had "messed them up." That night he went to the park. He substantiated Officer Carter's testimony concerning the arrest.

In rebuttal Detective Slattery stated that he had looked for knives in the apartment but did not find any where they would not ordinarily have been.

OPINION

■■ Defendant initially contends that Officers Carter and Ward lacked probable cause to arrest him at the gas station and that, therefore, the seizure of the pocket knife was unlawful and the testimony relating to it should not have been admitted. We think that it is not necessary to

decide the propriety of the arrest, since, even if it were improper, the error in admitting the testimony about the knife was harmless. The defense in this case was that the pocket knife had been used in self-defense. Defendant admitted stabbing his aunt with his pocket knife after, he claimed, she had stabbed him on the lip with a steak knife. This admission certainly obviated any possible error in the admission of testimony relating to a pocket knife found on the defendant at the time of his arrest. In fact, even if defendant had chosen to remain silent and not to assert the theory of self-defense, the testimony concerning his possession of the pocket knife at the time of his arrest could not have substantially prejudiced his case. The knife itself was not produced; therefore, the victim could not identify it as the knife used in the aggravated battery. The microanalyst, while finding blood on the knife, could not identify it as human blood, let alone the blood of the victim. As to the aggravated battery, this meager knife testimony is insubstantial in the light of the positive testimony of the victim, the exhibition of her scars, and the testimony of defendant's mother as to his intended whereabouts at the time of the assault. We conclude that the error, if any, in admitting testimony concerning the knife was harmless. We note also that defendant was not sentenced for the aggravated battery, which was the offense to which the knife testimony was relevant.

Defendant's next contention is that he was seriously prejudiced by alleged undue participation by the trial judge in the interrogation of witnesses. Defendant alleges that, in and by his participation, the trial judge manifested to the jury a belief in defendant's guilt, emphasized the State's evidence, and discredited a key defense witness. Defendant urges error in each of five instances in which the trial judge allegedly intruded. We will examine each instance.

■■ Defendant contends that the trial judge on two occasions had the victim repeat certain parts of her testimony, and thereby highlighted that testimony for the jury. The transcript of the first occasion reads as follows:

> "Prosecutor: After he did that, what happened?
>
> Mrs. Gayles: He started sweating, perspiration was running, and then he said to get up, he was going to kill me. And I begged for the children again.
>
> Defense Attorney: Objection, Your Honor, to the word begged.
>
> The Court: The objection is overruled. This was all at the same time immediately after he got off of you?
>
> Mrs. Gayles: Yes.
>
> The Court: That this remark was made?

Mrs. Gayles: Yes, sir.

The Court: All right."

This was an obvious attempt by the trial judge to clarify in his own mind and for the jury the time at which a certain remark was made and to reestablish the narrative flow of the witness' testimony, which had been interrupted by a defense objection. Nothing was added to the witness' testimony by the trial judge's questions, nor was what she had already said framed in a more prejudicial light. We think the trial did not abuse his discretion. *People v. Thompson* (1968), 91 Ill.App.2d 34, 234 N.E.2d 5.

The transcript of the second occasion reads as follows:

"The Court: Mr. Court Reporter, read back the last statement. Start at about where she said about her neighbor.

(The record was read by the reporter.)

Defense Attorney: I ask that be stricken, Your Honor, and the jury be instructed to disregard it.

The Court: No, that may stand, but I am trying to—I'd like to hear what the conversation was that she told her.

Prosecutor: With Mrs. Cole?

The Court: Yes.

Defense Attorney: I don't believe the witness recalls. Do you recall your conversation with Mrs. Cole?

Mrs. Gayles: Not clearly, no.

The Court: That's all she can remember. All right."

It is unnecessary to examine the motives of the trial judge in this instance because we think there was no error since nothing came from his inquiry. The witness simply could not answer his question and any potential error was thereby obviated.

Next, defendant alleges error in that the trial judge on his own initiative ordered the victim-witness to unzip her dress and exhibit her chest scars to the jury. Without objection, she had already exhibited to the jury the scars on her face and arms, which she claimed had been caused by the knife blows of defendant. The attorneys on both sides, however, were hesitant to request her to exhibit the chest scars concealed by her dress, and they offered to stipulate to the existence of those scars. From the colloquy, their reluctance seems to have stemmed solely from their apprehension that the public unzipping of the dress and the exhibiting of the chest scars to the jury would embarrass the witness and possibly the jury. The judge, however, saw no basis for embarrassment because the chest scars were "above the breast", and he, therefore, insisted on the exhibition of the chest scars. There is no hint of any apprehension that

the exhibition of the chest scars would be unnecessarily inflammatory.

The objection here is not to the evidentiary aspects of the required unzipping and exhibition of the chest scars, but rather to the fact that it was the trial judge who took it on himself to suggest and then to insist upon it. Although defendant does not expressly so state, the thrust of his objection, in order for the objection to be relevant, must be that, by reason of his voluntary intrusion in the process of adducing evidence, the trial judge became an advocate for the State to the necessary prejudice of defendant.

■■ But a trial judge must have the discretion to take the initiative in making the testing of a witness more understandable and intelligible to the jury where the parties have not done so and where he reasonably sees a need to do so. As long as he does so for the purpose of eliciting the truth, without conveying any impression of his feelings to the jury, there is no error. (*People v. Smith* (1960), 18 Ill.2d 547, 165 N.E.2d 333.) While we might think that, in view of the proffered stipulation, there was no need to insist on the exhibition of the chest scars to the jury, we cannot say that it was an abuse of discretion for the trial judge to do so. Nor do we think that, by doing so, he could reasonably be regarded as having become an advocate for the State by adducing evidence for the State.

The witness had already testified to the existence of the chest scars, and the parties had offered to stipulate to their existence, so that the evidence of the existence of the chest scars was already in the case and their exhibition was merely corroborative.

Even if we were to consider the trial judge's insistence on the exhibition of the chest scars as error, we note that defendant did not then object to it at all, much less for the reasons defendant now suggests on this appeal. The record shows that the attention of all involved was focused on the evidentiary aspects of the matter, and no one called the judge's attention to the aspect of the matter now assigned as error. Since a trial judge must have the discretion to which we referred above, we think that if, in a given instance, defendant feels that the exercise of such discretion entails the risk of becoming an advocate, it is incumbent on defendant to bring that potential to the attention of the judge, and his failure to do so constitutes a waiver. Finally, we note that the judge gave to the jury before it retired Illinois Pattern Jury Instruction Criminal No. 1.01, which provides in pertinent part as follows: "Neither by these instructions nor by any ruling or remark which I have made do I mean to indicate any opinion as to the facts or as to what your verdict should be." Illinois Pattern Jury Instruction Criminal No. 1.01[8].

Next, defendant asserts that the trial judge indicated to the jury his

disbelief in the testimony of defendant's mother during the following colloquy:

"Defense Attorney: And during that time period, had Junior ever gone over to the home of the complaining witness, Mrs. Gayles?

The Witness: Yes.

Defense Attorney: And do you know about how much during that time period he went to her home?

The Witness: Well, one evening—Junior go there all the time, quite a few times. I can't tell you how many. I can't say how many, because I didn't keep count. I don't know. He was over there all the time.

Defense Attorney: How many times a week would you estimate that he was over there?

The Witness: Well, Junior used to go over there—after Junior got his job, Junior used to go there every day after he leave work, you know. He get home about 5:15, 5:20. Every day Junior come in, he would go over there.

So, this evening, that one evening, he came in, I said, "Junior—"

The Court: Pardon me. Let me ask you just one question.

The Witness: Yes.

The Court: Do you mean to say that you know he went over there or did he tell you he went over there?

The Witness: He told me he was going over there.

The Court: But you didn't follow him to see where he went?

The Witness: No."

It is evident from the record that the trial judge was merely trying to clarify an ambiguity in the witness' testimony as to the frequency of defendant's prior visits to his aunt's home. *People v. Smith, supra.*

Finally, under this point, defendant asserts that the trial judge committed error during the motion to suppress the testimony as to defendant's possession of the knife at the time of his arrest (which testimony had been elicited duing the trial from the arresting officer) by exhibiting a fixed opinion as to its merits prior to due consideration of the motion, and by himself conducting the examination of the only witness (Officer Slattery) called to testify during the consideration of motion. As we have pointed out in treating defendant's first issue on appeal, the error, if any, in denying this motion was harmless in view of the other evidence presented at trial. But specifically, the trial judge's examination of Officer Slattery was proper since the witness had already been called once and had been thoroughly examined and cross-examined by both sides; but neither side had thereby elicited all the testimony which the judge felt that he needed in order to rule on the motion. Hence, he himself

examined the officer to elicit the truth and make understandable what had already been said. *People v. Smith, supra.* Our examination of the record reveals no prior "fixed opinion" as to the merits of the motion but rather a common sense approach by the trial judge. And, finally, even if the trial judge had exhibited a fixed opinion, there would have been no effect on the jury, since the hearing on the motion was held outside the presence of the jury.

■■ Defendant's final point on appeal is that his sentence was excessive. In particular, defendant asserts that the prosecutor improperly introduced in aggravation reference to facts relating to the murder, of which he had been acquitted, and that the trial judge relied on these facts in sentencing him to a term of from fifteen to forty-five years on the conviction for rape. Suffice it to say that, although we do not condone the conduct of the prosecutor, neither can we discover any basis in the record for finding that the trial judge relied on the improper reference by the prosecutor to facts relating to the death of Cedrick in determining the sentence. In the absence of any such indication, it is presumed that the trial judge disregarded the improper reference. *People v. Fuca* (1969), 43 Ill.2d 182, 251 N.E.2d 239; *People v. Tolefree* (1973), 14 Ill.App.3d 754.

The sentence, however, must also be examined in the light of recent legislation. Section 8—2—4 of the Unified Code of Corrections (Ill. Rev. Stat., 1972 Supp., ch. 38, sec. 1008—2—4) states in pertinent part:

> "Prosecution for any violation of law occurring prior to the effective date of this Act is not affected or abated by this Act. If the offense being prosecuted has not reached the sentencing stage or a final adjudication, then for purposes of sentencing the sentences under this Act apply if they are less than under the prior law upon which the prosecution was commenced."

The offense of rape is now characterized as a Class 1 felony. (Ill. Rev. Stat., 1972 Supp., ch. 38, sec. 11—1(c).) Class 1 felonies have a maximum term of "any term in excess of four years." (Ill. Rev. Stat., 1972 Supp., ch. 38, sec. 1005—8—1(b)(2).) The minimum term for a Class 1 felony "shall be 4 years unless the court, having regard to the nature and circumstances of the offense and the history and character of the defendant, sets a higher minimum term."

■■ Since this cause had not been finally adjudicated as of the effective date of the Unified Code of Corrections, defendant is entitled to any benefit to be derived from its sentencing provisions. (*People v. Harvey* (1973), 53 Ill.2d 585, 294 N.E.2d 269.) Here the minimum term imposed on the defendant exceeds four years. However, the trial judge's remarks during sentencing should be noted. He stated:

"The Court will not give the sentence recommended by the State's Attorney, but I certainly think that this is one of the most hideous crimes that I have heard of within recent years. I have been in this court for over two years. This is a hideous type of thing. There is no question about it. The very fact that it was perpetrated upon a very close relative of the family, his own Aunt, his own Aunt. And actually, there is no good reason why he should lean backwards, the Court to see that he gets the smallest kind of sentence. The Court, therefore, will sentence him to the Illinois State Penitentiary for a period of from fifteen to forty-five years."

It is evident from these remarks and those of defense counsel during mitigation that the trial judge did have "regard to the nature and circumstances of the offense and the history and character of the defendant" in setting a fifteen-year minimum. This "regard" brings the fifteen-year minimum within the provisions of the new Code.

We do not consider the fifteen to forty-five year sentence under the new code as excessive in this case, having regard to the nature and circumstances of the offense of which defendant was convicted. *People v. Evans* (1973), 12 Ill.App.3d 1036, 299 N.E.2d 364; *People v. Winfield* (1971), 133 Ill.App.2d 48, 272 N.E.2d 848.

For the reasons set forth above the judgment of the Circuit Court is affirmed.

Judgment affirmed.

LEIGHTON and DOWNING, JJ., concur.