THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* HERMAN WATKINS *et al.* (Impleaded), Defendants-Appellants.

(No. 57085;

First District (3rd Division)—October 17, 1974.

Levin & Novoselsky, of Chicago (Henry N. Novoselsky, Irwin G. Jann, and G. Michael Cooper, III, of counsel), for appellants.

Bernard Carey, State's Attorney, of Chicago (Patrick T. Driscoll, Jr., and Scott W. Petersen, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE McNAMARA delivered the opinion of the court:

Defendants, Herman Watkins and Ronald Gary, were charged with attempt murder, armed robbery, and aggravated battery. After a jury trial in the circuit court of Cook County, defendants were acquitted of the charge of attempt murder and convicted of armed robbery and aggravated battery. Gary was sentenced to 40 to 100 years for armed robbery and 4 to 10 years for aggravated battery, the sentences to run concurrently. Watkins was sentenced to 20 to 40 years for armed robbery and 4 to 10 years for aggravated battery, the sentences to run concurrently. Joseph Brooks was indicted with defendants on these same charges but, as we shall examine later, the charges were nolle prossed by the State.

On appeal defendants contend that the trial court erred in denying their motion to suppress evidence; that they were denied due process of law by not being promptly taken before a magistrate; that they were deprived of a fair trial in which they could fully present evidence and cross-examine witnesses; that the trial court erred in denying their motion to suppress the identification testimony; that the court erred in permitting the jury to consider evidence which had been improperly introduced; that they were not proved guilty beyond a reasonable doubt; and that the sentences imposed were excessive.

On December 16, 1970, at approximately 2:30 A.M., an armed robbery occurred at a mail order plant of Sears, Roebuck and Company in the city of Chicago. Two Sears' employees, Tommy Brooks (not related to Joseph Brooks) and Walter Lada, were collecting cash receipts in the plant when they were approached from the rear by two men, one of whom brandished a pistol. After ordering the two employees to "freeze," the gunman shot Lada in the face. As a result of the shooting, Lada was severely injured, and he was described at trial as having "no speech" and "very little by way of recognition and carrying on judgment." At the

sound of the gunfire, Tommy Brooks dove to the floor. The robbers snatched the bag of cash and raced down a corridor to an emergency exit. A waiting auto, driven by a third person, drove them away. The defendants, arrested on unrelated charges on December 19, were subsequently charged with the present crimes.

We consider initially what we believe to be the determinative issue of this appeal: whether defendants were denied a fair trial in which they could fully present evidence and properly exercise their right of cross-examination. To understand the issue, it is necessary to set forth in detail a chronology of the pertinent court proceedings.

Prior to trial, defendants and Joseph Brooks sought leave to file a motion to suppress identification testimony. The prosecutors did not object, but informed the court that it was the accuseds' last day to stand trial under the Four Term Act. The trial judge thereupon ruled that the motion to suppress could be filed, that jury selection would commence, and that the motion to suppress would be heard.

At the hearing on the motion to suppress identification testimony, Tommy Brooks testified to the pretrial procedures employed by the police, including the manner of his identification of Gary at a lineup on December 19, 1970.

After the witness had been excused, a jury was called. The court made preliminary remarks to the prospective jurors, informing them of the nature of the charges, and introducing the three accuseds, their counsel, and the prosecutors. The court then commenced the voir dire examination, and a panel of four jurors was selected. Jury selection was continued for a day, and the hearing on the motion to suppress identification testimony resumed.

Jessie Sharp, a Sears' employee, testified that three women employees of Sears and he were picked up by the police and taken to a police station on December 17, 1970, to view mug shots. No identifications were made. He returned to the police station on December 21 and viewed two books of photographs. When he was again unable to make any identifications from the photographs, he was shown two photographs of a lineup conducted on December 19. Sharp identified Joseph Brooks from these latter photographs.

After the witness had been excused, Harry Picardi, another Sears' employee, took the stand. He had just begun to testify when the prosecutor interrupted to inform the court that because "certain developments" had arisen, the State had "no choice" but to nolle prosse the case against Joseph Brooks. Counsel for defendants objected, stating that the jury process selection had begun and that this action would have to be explained to the jury. After allowing the State's motion, the trial court stated

for the record that it had offered defendants a mistrial, which they had refused.

The hearing on the motion to suppress identification testimony then resumed. Picardi testified that on December 19, after viewing a lineup, he identified Joseph Brooks and the two defendants as the robbers. William Binder, also a Sears' employee, testified that he viewed 10 mug shots before attending the lineup. At the lineup, he identified Joseph Brooks and the two defendants. At the hearing Binder was asked if he saw Brooks in the courtroom. Binder then identified Watkins as Brooks. When asked to identify Watkins, Binder pointed out Gary. The witness then erroneously stated that Joseph Brooks was not present in the courtroom.

After the trial court had denied defendants' motion to suppress the identification testimony, defendants' counsel inquired as to what explanation would be furnished the jury regarding Joseph Brooks' absence. Counsel expressed the fear that the jury would infer that Brooks had pleaded guilty. The judge replied that he would tell the jury that it could no longer consider any case against Joseph Brooks. Defense counsel, while declining to move for a mistrial, responded that the State had placed defendants in the difficult position of asking for a mistrial or breaking their term by the nolle prosse of the charges against Joseph Brooks.

When court reconvened, the State requested that defense counsel be precluded from mentioning to the jury the actions taken by the State in relation to Brooks. The trial judge stated that he considered Brooks to be an "integral part" of the case. Defense counsel stated that Brooks had a very strong alibi which would counter the identifications of him, and that defendants should not be restricted in advance from offering evidence as to what had occurred. Thereupon, the trial judge, over the objections of both sides, declared a mistrial and dismissed the panel of jurors already selected.

Thereafter, a new jury was selected. The trial court denied defendants' motion to dismiss the indictment on the ground of double jeopardy. At trial the court sustained the State's objections to defense counsel's attempts to adduce testimony from State witnesses that they had identified Joseph Brooks as one of the three robbers.

For the purpose of considering the issue in question, the pertinent trial testimony may be summarized briefly. Tommy Brooks testified that Walter Lada and he had been robbed in the Sears' plant by two men. He identified Gary as the man who had shot Lada. Binder and Picardi testified that on the day of the robbery they had noticed a man, whom they identified as Watkins, standing outside the Sears' plant near a dirty, rusty auto with its car hood up. They subsequently observed two men run out

of the plant and enter the vehicle. Watkins slammed down the hood and drove off. The two witnesses identified Gary as one of the two men who entered the auto. Walter Lada testified that Watkins was the man who had shot him.

Defendants denied any participation in the crimes, and offered evidence of an alibi, supported by witnesses. Defense counsel also made a detailed offer of proof outside the presence of the jury concerning the alibi of Joseph Brooks. His argument essentially was that the State's nolle of Joseph Brooks, in light of the identifications of him as a participant in these crimes and the alibi he was apparently prepared to use at trial, gave rise to an inference of possible mistaken identification, which the jury should be able to consider. The trial court sustained the State's objection to the offer of proof.

Defendants' contention of constitutional deprivation stems from two circumstances: first, the declaration of a mistrial by the trial judge, and secondly, the restrictions placed on the defendants prohibiting their counsel from questioning the State's witnesses regarding their identification of Joseph Brooks as one of the perpetrators of the crimes.

■■ The decision to declare a mistrial, while it should be exercised with caution, rests within the sound discretion of the trial court, and will not be disturbed on review unless there has been an abuse of that discretion. (*People v. Laws* (1963), 29 Ill.2d 221, 193 N.E.2d 806; *People v. Thomas* (1958), 15 Ill.2d 344, 155 N.E.2d 16, *cert. denied* (1959), 359 U.S. 1005.) In the present case, the trial court did not abuse its discretion in declaring a mistrial. We also hold that the trial court correctly denied defendants' motion to dismiss the indictments based upon their claim of double jeopardy.

■■ We believe, however, that the trial court committed reversible error in not allowing defense counsel to cross-examine the State's witnesses as to their identification of Joseph Brooks as one of the robbers. We recognize that the scope of cross-examination ordinarily rests within the sound discretion of the trial court. (*People ex rel. Walker v. Pate* (1973), 53 Ill.2d 485, 292 N.E.2d 387.) However, when identification is in issue, defendants should be given considerable latitude on cross-examination of the identifying witnesses to test the identification, the means of observation, and the memory of the witnesses. *People v. Struck* (1963), 29 Ill.2d 310, 194 N.E.2d 236.

In the present case, despite the fact that during the hearing on the motion to suppress the identification three witnesses positively identified Joseph Brooks as one of the robbers, the State unexplainably nolle prossed the charges against Brooks. It is undisputed that Brooks never appeared as a State's witness at the trial and that he has never been brought to

trial on the present charges. Moreover, defense counsel's argument and detailed offer of proof made outside the presence of the jury that the reason for the nolle prosse was the legitimacy of Brooks' alibi has gone unchallenged by the State. Clearly, under these circumstances, defendants, both of whom were similarly identified at trial by two of the witnesses in question and both of whom also raised defenses of alibi, should have been permitted a reasonable inquiry and cross-examination of Binder and Picardi regarding the circumstances surrounding their prior identifications of Joseph Brooks as a participant in these crimes. Since the State had placed Brooks with defendants at the scene of the robbery, questioning the State's witnesses regarding their ability to observe, recollect, and narrate as to the actions of Brooks, based upon the facts in this case, certainly would be pertinent to their ability to do likewise as to the activities of the defendants.

Since at this point in time it is a matter of conjecture to project the precise nature and effect of the testimony that will be adduced upon defense counsel's cross-examination of the identification witness upon remand, we deem it necessary to consider a question related to our above holding which may come up at the new trial: If during cross-examination the identification witnesses persist in their claim that Joseph Brooks was a participant in the robbery, should the defense be permitted to introduce substantive and competent evidence of Joseph Brooks' alibi at trial, assuming (without deciding) that a proper evidentiary vehicle exists to carry it into evidence?

■■ The determination of the propriety of cross-examining a witness for the purpose of later contradicting his answers is dependent upon the relevancy of the cross-examination. (*People v. Kirkwood* (1959), 17 Ill.2d 23, 160 N.E.2d 766, *cert. denied* (1960), 363 U.S. 847; *People v. Sisti* (1967), 87 Ill.App.2d 107, 230 N.E.2d 500.) One obvious reason for not permitting cross-examination and correlative impeachment on a matter is that the law does not require a witness to come to trial prepared to sustain every statement he might make regardless of its materiality to the central issues at trial. Furthermore, the courts are wary of confusing the issues before the jury and causing unfair surprise to the witness. (3A Wigmore, *Evidence* § 1019, at 1008-1009 (Chadbourn rev. ed. 1970).) Facts will be considered non-collateral, and hence open to impeachment, if one of two tests is satisfied: the facts are relevant to substantive issues in the case or are independently provable by extrinsic evidence, apart from the contradiction, to impeach or disqualify the witness. McCormick, *Evidence* § 47, at 98-99 (Cleary Ed. 1972); Wigmore, *supra*, §§ 1020-1024, at 1009-1020.

■■ It is our belief that the evidence of the alibi would be relevant in

this case to substantive issues in the case, namely, the correctness of the identifications of the participants in the robbery. At the very least the conduct of the State regarding the unexplained nolle prosse of Brooks may raise a question as to the correctness of the identification of Joseph Brooks. Although any error in that regard certainly would not be conclusive on the correctness of the identification of defendants, the triers of fact should have before them all revelant evidence bearing on the identifications. Consequently, if the defense is able to utilize proper evidentiary procedures in an attempt to place before the triers of fact evidence of Brooks' alibi upon the witnesses' persistence in their identification of him as a participant in the crime, we are of the opinion that the defense should be permitted to do so.

■■ Since we are remanding the cause, we must comment on several assignments of error. We find no merit in defendants' contention that they were deprived of due process because they were not immediately taken before a magistrate after arrest. Defendants were taken before a judicial officer in less than a day, and such a time period did not constitute an unnecessary or unreasonable delay. Ill. Rev. Stat. 1971, ch. 38, par. 109—1(a); *People v. Higgins* (1972), 50 Ill.2d 221, 278 N.E.2d 68, *cert. denied* (1972), 409 U.S. 855.

We will next consider defendants' contention that the trial court erred in denying their motion to suppress the evidence. The hearing on this motion was conducted sometime prior to the motion to the identification testimony and before the charges against Joseph Brooks had been nolle prossed.

At the hearing, Joseph Brooks testified that on December 19, 1970, at about 4 A.M., he was driving an automobile with defendants as his passengers. He was pulled over to the side by the police near Roosevelt Road and Ashland Avenue in the City of Chicago. Brooks got out of the car and went back to the police car. The police told him to get in their squad car. Upon being told that he was driving with improper lighting, Brooks was asked to produce his driver's license. Brooks replied that he was driving on a ticket, which he showed the police officers. While Brooks remained in the squad car and defendants stayed in the parked car, the police forced open the trunk to his car and saw several types of guns. The officers then ordered defendants out of the car, searched them, and put them in the back of the police car. The interior of the stopped car was then searched. Brooks further testified that he never gave permission for the police to search him or his car, and was not shown a search or arrest warrant.

Dennis Liss, a Chicago police officer, testified that while riding on patrol in a marked squad car, he and his partner, Officer Patrick Sullivan,

stopped a car driven by Joseph Brooks for improper use of bright lights. Brooks and Sullivan exited their respective cars and engaged in a discussion near the rear of the stopped auto. Liss then exited the patrol car on the passenger side. Upon hearing Brooks remark that he did not have a driver's license and upon failing to see Brooks produce a ticket permitting him to drive, Liss glanced toward Brooks' auto and observed the front seat passenger, later identified as Watkins, reach or bend toward the floor of the auto. Liss proceeded to walk to the front of the car and order Watkins to step out. The officer did not draw his revolver or inform his partner of what he had seen. As Liss opened the door on the passenger side, he stepped to the left and noticed a small-caliber derringer lying on the floor under Watkins' feet. Liss searched Watkins at the rear of the vehicle while Gary remained in the back seat and while the gun remained on the floor of the front seat. Brooks and Gary were subsequently searched, but nothing was found on their persons. Liss then searched the interior of the car and the car trunk. Liss tugged at the trunk to open it. Inside the trunk the officer found several guns, including a .38-caliber pistol.

Brooks received tickets for improper use of lights and for no driver's license. The three men were taken to the police station and during processing were noted as robbery suspects.

During the cross-examination conducted by Joseph Brooks' attorney at the hearing, Officer Liss stated that the movement by Watkins in the car caused him to feel he and Officer Sullivan were in jeopardy. He further asserted that his motivation in going up to Watkins was only to search the suspect, not to arrest him.

Immediately thereafter, upon further examination conducted by the attorney representing defendants, Liss testified that his action in opening the car door had not been prompted by the movement in the car but rather by the knowledge that Brooks did not have a driver's license. When Liss was confronted at the hearing with his report detailing the reason for his search of the car to be Watkins' action in "putting an unknown object to the floor," the witness asserted that the report was wrong. However, Liss denied falsifying the report.

Officer Sullivan testified that he was the driver of the police car which had stopped Brooks' auto. Brooks' car had its bright lights on and one front light off. The officer admitted at the hearing that he did not know what the law is regarding the use of bright lights. After the stop, both Sullivan and Brooks exited their respective vehicles. According to Sullivan, a discussion between the two men ensued near the door on the driver's side of Brooks' auto, while Liss approached the vehicle from the other side. Brooks told Sullivan that he did not have a driver's license.

When Sullivan told Liss they would have to take Brooks in to the station because the latter did not have a license, Liss ordered Watkins out of the car. According to Sullivan, Liss then either reached down under the seat or looked at the seat and stated there was a gun in the car. The officers then frisked the three men and searched the car, including the trunk.

Defendant Watkins testified that he was sitting in the front seat when the auto was stopped. When Brooks left the auto to talk to the police, Watkins got up on his knees on the front seat to look out the rear window. He observed Liss open the trunk of Brooks' auto and subsequently order him and Gary out of the auto to be searched.

Defendant Gary testified that when Brooks was asked for a driver's license, he observed Brooks hand some sort of paper to the officer.

At the conclusion of all the testimony, the court denied the motion to suppress evidence. At trial, none of the weapons found in the vehicle were received in evidence. However, a .38-caliber pistol found in the trunk was marked for identification as a State's exhibit and was displayed and identified as a gun "like" the one used in the Sears' robbery. The court subsequently refused to admit it into evidence.

■■ Constitutional safeguards against unreasonable searches and seizures do not prohibit all searches made without a warrant, but only those which are unreasonable, and the determination of the reasonableness of any given search is dependent upon the facts of a particular situation. *Go-Bart Co. v. United States* (1931), 282 U.S. 344.

In evaluating the conduct of the police, we begin with a recognition that a valid traffic stop occurred. Although Officer Sullivan admitted to some unfamiliarity with the law on the subject, the undisputed testimony of Officer Liss was that the vehicle was stopped for improper use of bright lights. Moreover, the court could very well accept Officer Sullivan's testimony that once Brooks stated that he did not have a driver's license, a custodial arrest situation developed as to Brooks.

It is our belief that the subsequent search of the front of the vehicle was justified. The undisputed facts reveal that the stop for a traffic violation occurred near Roosevelt Road and Ashland Avenue at approximately 4 A.M. In addition to the driver, the vehicle contained two riders. After the stop, the driver exited the vehicle and talked to Officer Sullivan. The other police officer left the squad car and soon thereafter noticed movement from the front seat passenger in the stopped vehicle. Although Officer Liss characterized the movement as a man bending or reaching down, the passenger asserted that it consisted of his kneeling on the front seat and looking out the rear window.

· Under the circumstances, the trial judge was entitled to believe that Officer Liss became fearful that the passenger in the front seat was armed

and that further investigation was warranted. While we recognize the fact that Liss did not draw his gun or warn his partner who was talking to the driver of the car, nevertheless Liss took immediate action in opening the car door and ordering the passenger out.

The defendants make much of Liss' statement on cross-examination that his motivation in searching the car was the fact that Brooks did not have a driver's license. While a routine traffic stop will not in and of itself permit a full-blown search of the driver by the police (*People v. Jordan* (1973), 11 Ill.App.3d 482, 297 N.E.2d 273), in this case the officer also testified that the movement in the car caused him to feel fear for his own and his partner's safety. We believe the trial court could properly determine that both events motivated the officer's action.

■■ In our opinion, the search under the seat where Watkins had been sitting was reasonable on the basis of *Terry v. Ohio* (1968), 392 U.S. 1. In that case, the court was concerned with striking a balance between the safeguarding of a person's right to privacy and to be free from unreasonable searches and seizures and protecting a police officer from bodily harm and preventing and deterring crime where there is less than probable cause to make an arrest and conduct a full incidental search of a suspect. The court held that, even absent probable cause, where an officer "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous * * * and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him." *Terry v. Ohio, supra,* at p. 30.

Although *Terry* involved a limited intrusion of one's person, in our view, *Terry* would not be adverse, in a case having facts as these, to permit an officer to conduct a restricted search of the area of the vehicle in which the suspicious movement was observed. It would appear illogical, if not foolhardy, to say that, where suspicious movement is noted in a particular part of a vehicle, the person may be asked to step out and be frisked for the protection of the officer, and then not allow an inspection of the place where the movement was sighted. See *United States v. Fern* (7th Cir. 1973), 484 F.2d 666.

A more difficult issue is presented concerning the propriety of the search of the trunk. However, in our judgment, the search of the trunk was also justified. In *Chambers v. Maroney* (1970), 339 U.S. 42, the Supreme Court, reaffirming its earlier holding in *Carroll v. United States* (1925),

267 U.S. 132, held that where a police officer possesses probable cause at the scene of an arrest that the contents of an auto offend against the law and where there exists exigent circumstances, a warrantless search of the auto is constitutionally permissible. While the court in *Chambers* noted that the standard for searching an automobile without a warrant is somewhat less strict than the one for searching a fixed piece of property, the "word 'automobile' is not a talisman in whose presence the Fourth Amendment fades away and disappears." *Coolidge v. New Hampshire* (1971), 403 U.S. 443, 461-462.

In *People v. Brown* (1937), 38 Ill.2d 353, 231 N.E.2d 577, the police officers stopped the car because it had no State license plates. They learned that the car also had no city sticker, that the driver had no driver's license, and that the driver's alleged car title was incomplete. The officers also noted a set of golf clubs and some clothing in the car for which the driver could not give any explanation. Accordingly the court held that the officers had a valid reason to suspect that the car had been stolen, permitting a search of the trunk. In *People v. Carter* (1937), 38 Ill.2d 496, 232 N E 2d 692, *cert. denied* (1968), 391 U.S. 965, police officers had stopped an auto at 3:30 A.M. for failure to have the rear license plate illuminated. After the officers noted that the car was similar to one used in a recent attempted armed robbery, the officers questioned the driver as to his destination. After the driver gave an evasive and illogical answer, he contradicted it with an improbable one. These facts gave rise to reasonable cause to search the car, including the trunk. (Also see *People v. Hanna* (1969), 42 Ill.2d 323, 247 N.E.2d 610.) At 5 A.M. police officers in *People v. Ricketson* (1970), 129 Ill.App.2d 365, 264 N.E.2d 220, stopped defendant after they had observed the rear license plate hanging in violation of the state motor vehicle code. After defendant consented to a police officer's request to look inside a briefcase which was stamped on the outside with initials that did not correspond to defendant's, guns and burglary tools were discovered. The officers then searched the trunk, which yielded several stolen items. The court sustained the trunk search on the basis of *Chambers*. Finally, we sustained the trunk search in *People v. Jefferies* (1972), 6 Ill.App.3d 648, 285 N.E.2d 592, *cert. denied* (1973), 410 U.S. 932. In that case, a police officer driving at night in an unmarked squad car in an area of several break-ins observed a car bearing one license plate sitting outside an abandoned house with its headlights on. As the officer approached, the driver turned down an alley. When the officer went up to the car and asked the driver for his driver's license, the driver responded that he did not have any, and he was placed under arrest. The driver also could not furnish registration for the car. After defendant requested his coat from the back seat, an officer handed it to

him after searching it and finding a straight blade knife. Several pairs of gloves were also observed on the floor of the car. The officers then searched the trunk and found stolen items. The court sustained the search on the basis that the police possessed facts indicating a more serious crime had been committed.

■■ In the present case, the officer made a valid traffic arrest at approximately 4 A.M. in what may be described as a high crime area in Chicago. After it was determined that the driver had no driver's license, one of the police officers noticed a suspicious movement on the part of one of the passengers. Upon opening the vehicle door, the officer discovered a gun on the floor of the front seat of the vehicle. Confronted with all these facts, the police officers were entitled to believe that a more serious crime had been committed. Additionally, the fact that the vehicle was still mobile reflects the presence of exigent circumstances. The search of the trunk was justified.

■■ The final issue that must be resolved is the propriety of the action of the trial court at the hearing on the motion to suppress identification testimony in sustaining all objections by the State to defense questions regarding the opportunity of the identification witnesses to observe defendants during the course of the crimes. This was error. Of itself, it would not constitute reversible error. (See *People v. Steel* (1972), 52 Ill.2d 442, 288 N.E.2d 355.) However, since the cause is being remanded, should the defense again seek to suppress the identification testimony, the trial court is directed to permit the defense to conduct a reasonable inquiry of the witnesses concerning their opportunity to observe the defendants during the occurrences.

Because of our holdings on the foregoing issues, it is unnecessary to consider the other issues advanced by defendants.

For the reasons stated, the judgments of the circuit court of Cook County are reversed, and the causes are remanded for further proceedings not inconsistent with the holdings of this opinion.

Judgments reversed and remanded.

DEMPSEY and MEJDA, JJ., concur.