THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
DUFFIE STANLEY CLARK, Defendant-Appellant.

First District (2nd Division)  No. 61426

Opinion filed November 29, 1977.

James J. Doherty, Public Defender, of Chicago (Ronald P. Alwin, Robert B. Thompson, Anthony Pinelli, and Jack L. Uretsky, Assistant Public Defenders, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Larry L. Thompson, Timothy Quinn, and Michael W. Ward, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE DOWNING delivered the opinion of the court:

Following a jury trial, Duffie Clark (defendant) was convicted of the murders of Bobby Leonard and Helen Navarro on September 1, 1971,

and sentenced to a term of 40 to 140 years. Co-defendant, Ray Stafford, was found not guilty of the murders. Defendant appeals from his conviction, raising 10 issues for our consideration: (1) whether he was proven guilty beyond a reasonable doubt; (2) whether the trial court erred in denying his pretrial motion to suppress certain physical evidence seized from his home after he had been removed to the police station; (3) whether the trial court denied him his rights to confront the witnesses against him and to compulsory process when it quashed a subpoena calling for the production of certain juvenile court records for use in the cross-examination of the principal State's witnesses; (4) whether the trial court allowed improper cross-examination of the defendant and highly prejudicial evidence on rebuttal; (5) whether the trial court placed improper restrictions on his cross-examination of the State's witnesses, and thus denied him a fair trial; (6) whether the refusal of the trial court to allow the introduction of the results of a polygraph examination was a denial of due process; (7) whether the trial court denied him due process when it allowed the prosecution to impeach a defense witness using a police statement which was not tendered to the defense in response to its discovery motion; (8) whether the State knowingly presented false testimony; (9) whether the trial court erred in refusing to dismiss the indictment due to alleged spoliation of evidence; and (10) whether, under the totality of the circumstances and the cumulation of all the errors, he was denied a fair trial.[1]

Between 7:30 and 8 p.m. on September 1, 1971, Bobby Leonard and Helen Navarro were shot and killed near the intersection of 51st Place and Peoria Street in Chicago. Police officers arriving at the scene gave varying accounts of the events which followed. Sergeant Kneisley testified that he was the first police officer to arrive at the scene. He spoke briefly with Bobby Hisson, who said that a boy named "Stan" had done the shooting and that he knew where Stan lived. Hisson got into the squad car with Kneisley and drove to the area of 5213 S. Green Street, about 1½ blocks

---

[1] We granted the parties the right to file briefs in excess of the 75-page limitation for printed briefs established in Supreme Court Rule 341(a) (Ill. Rev. Stat. 1975, ch. 110A, par. 341(a)). In our opinion, the briefs filed by both parties far exceeded a meaningful and helpful size. In this connection we are reminded of the admonition of our supreme court in *People v. Peter* (1973), 55 Ill. 2d 443, 447, 303 N.E.2d 398, that:

> "We are well aware that defendants often charge that they were represented by incompetent counsel and we are sympathetic with the desire of attorneys to avoid such a charge. We do not feel, however, that it is necessary to make an appellant's brief a catalogue of every conceivable error. A defendant is not entitled to an error-free trial and few trials are free from error. A more selective presentation involving substantial rights or matters prejudicial to the defendant would more precisely define the issues."

The sentiment expressed in this quotation applies with equal force to the brief submitted by the State in this case, which exceeds defendant's "catalogue of errors" by more than 100 pages.

from the scene of the shootings. By the time they arrived, other police officers were at the scene, bringing defendant and two other black males out of the house. Hisson then identified defendant to Sergeant Kneisley as Stan, the shooter.

Another police officer, Officer Gallagher, testified that he spoke to a group of children, including Hisson, at the scene of the crime. He obtained a general description of the shooter as wearing a green, sleeveless t-shirt and dark or khaki-colored pants. Gallagher testified that Hisson provided most of the description and that Hisson had given him the name "Stan" and the 5213 S. Green address. Gallagher then proceeded to that location, where he and his partner observed a group of four black males standing in front of the house. One of them matched the description of the shooter. Upon approaching the group and identifying themselves as police officers, the four ran into the house. The officers pursued. Gallagher entered a bedroom and observed defendant pulling on a pair of white pants. He was not wearing a shirt. Gallagher placed defendant under arrest. Other police officers arrested Joe Gilliam and Andrew White. As Gallagher led defendant from the house, he heard Bobby Hisson tell Sergeant Kneisley, "That is the man." Ray Stafford, the co-defendant, was arrested later that evening.

Defendant was taken to the police station and placed in a lineup. He was positively identified as the shooter by Margie Flynn, Bobby Hisson, Albert Radke, and Timothy Day. All four of these witnesses also gave statements to the police. On September 18, 1971, the grand jury returned indictments charging defendant, Ray Stafford, Andrew White, and Joe Gilliam with the murders of Bobby Leonard and Helen Navarro.[2]

Prior to trial, defendant moved to suppress certain items of clothing, including a green, sleeveless t-shirt taken from defendant's home without a warrant by police officers after he had been taken to the police station. Following a lengthy hearing, the trial court denied the motion.

At trial the State's case was based on the positive identifications made by Hisson, Flynn, Radke, and Day. The defense was mistaken identification, alibi, and fabrication of testimony, especially that of Timothy Day.

Bobby Hisson testified that at approximately 8:45 p.m. on September 1, 1971, he and Margie Flynn were· having a conversation with Helen Navarro on south Peoria Street, just north of an alley which intersects Peoria Street and runs east and west between 51st Place and 52nd Street, when they saw a man, whom he identified as the defendant, standing in the alley holding a short-barrelled shotgun to his shoulder. The man said,

---

[2] Charges in connection with the killings against Gilliam and White were eventually dismissed by the State.

"Move, girls," and fired two shots in their direction. Hisson attempted to push Flynn out of the way and fell to the ground. From his position on the ground, Hisson could see the gunman, a man he had known previously by the name "Stan," fire three more shots. Stan was wearing a dark, sleeveless t-shirt and dark pants. Hisson looked away from the gunman to see where Flynn had gone. When he looked back, the gunman was gone. Helen Navarro lay on the sidewalk, a bullet wound in her right eye. (She died shortly after her arrival at a hospital.)

Margie Flynn corroborated Hisson's account of the sequence of the shooting. However, she saw two men standing in the alley, as well as three or four others standing behind the two. She described the shooter as a black man with a goatee, wearing a dark sleeveless t-shirt and dark pants. Flynn also positively identified defendant in court as the shooter.

Albert Radke testified that he had been playing in a vacant lot at 52nd Street and Peoria (just south of where the gunman had stood) with his friend Marky Miller at the time of the murders. The sound of two shots attracted his attention. He looked in the direction of the sounds and saw the defendant and Ray Stafford standing in the alley. Defendant was holding something up to his shoulder. Radke and his companion, frightened by the shooting, ran east on 52nd Street toward the latter's house, on 52nd just east of Green. En route, they passed the Richards' house, where Radke's mother was visiting on the porch with Mrs. Richards. When he reached Miller's house, he heard his mother calling him. He began to run back toward his mother when he saw three black men come out from a "gangway" between two buildings. The men ran south on Green Street and into another gangway on the east side of Green. He then saw defendant run out from another gangway. Defendant ran right past Radke. At this time defendant was carrying a rifle and was wearing a dark-colored "dago" t-shirt, dark pants, and sandals with white socks. Radke observed defendant set the rifle down on some stairs at "Nelson's house" when he heard Stafford yell, "Come here." Defendant picked up the rifle and ran toward Stafford.

Timothy Day testified that he also saw defendant, Stafford, and others standing in the alley. He had been sitting on a porch near 51st Place and Peoria when he heard the first two shots. He then walked toward the corner and heard more shots. When he reached the corner, he saw defendant, whom he had known previously as "Stan," holding a rifle to his shoulder. He also saw Stafford holding a pistol. He could not see what kind of pants defendant wore because some bushes partially obstructed his view. He could see, however, that defendant wore a green, sleeveless "dago" t-shirt. He then saw defendant and Stafford run through the vacant lot toward 52nd Street.

On cross-examination, Day was confronted with a statement he had given police shortly after the shootings in which he stated that he had seen seven or eight blacks walk north on Peoria and fire the shots eastward on 51st Place. His explanation was that his directions were mixed up. He denied the substance of the statement and later in his testimony, he denied making the statement at all.

Later that evening, Hisson, Flynn, Radke, and some of their respective parents were taken to the police station where defendant was being held. Flynn and Hisson were taken there in the same police car, but denied talking about the crime en route. At the police station they all waited together for several hours in the station commander's office until the lineup was conducted. There is conflicting evidence as to whether Timothy Day was also in the office. It was during this period of time that the defendant maintains that Hisson, for whatever personal motive, persuaded the others that defendant was the shooter.

The State also presented the testimony of Delores Coluzzi, who lived next door to defendant's family on Green Street. Her testimony was that she was sleeping in a front bedroom of her home when she was awakened at approximately 8:30 p.m. on September 1, 1971. The noise which had awakened her was something that "sounded like glass breaking." She looked out the window toward defendant's house and saw four black men, whom she knew, standing on the sidewalk. Defendant, wearing dark clothing, was among the group. A few minutes later she saw the men run toward 52nd Street. Defendant was in the lead, carrying an object approximately 1½ feet long. She was still looking out the window five or 10 minutes later when the men returned, pursued by the police.

After defendant was removed to the police station, Officer Gallagher returned to defendant's home and recovered a green, sleeveless t-shirt and several other items of clothing. He did not find any khaki-colored or dark pants in defendant's bedroom. The murder weapon was not recovered.

Defendant, testifying in his own behalf, related that he was in his bedroom with his girl friend, Clemmie Jean Richmond, at the time of the killings. They had been together since 8 p.m. He heard the sound of glass breaking outside and he heard his mother scream. As he began to run outside, he was stopped and arrested by the police. He denied any knowledge of, or participation in, the Leonard-Navarro killings.

Clemmie Jean Richmond corroborated defendant's alibi. On cross-examination, however, she was confronted with the first of two statements she had given to police on September 2, 1971. Her account of the events of the evening before were substantially different in the second statement.

Defendant's alibi was also corroborated by the co-defendant, Stafford,

and his girl friend, Ada Green, who occupied the bedroom next to defendant's. They were not able, however, to account for his whereabouts at the time of the crime.

The defense offered to present evidence of a polygraphic examination defendant underwent which allegedly established that he was telling the truth when he denied knowledge of, or participation in, the killings. The court allowed an offer of proof, but refused to allow the polygraph examination into evidence.

On rebuttal, Timothy Day was recalled to testify that he had seen the defendant with a gun on August 31, 1971. On that occasion defendant had fired the rifle at Day, Bobby Leonard, and two other boys.

I.

Defendant contends the trial court erred when it denied his pretrial motion to suppress the green sleeveless t-shirt removed from his home after he had been arrested and removed to the police station. The only evidence at the hearing on defendant's motion was admitted by stipulation. That evidence showed that Chicago police officers had returned to defendant's home after he had been taken to the police station and conducted a warrantless search of the premises. They seized several items of clothing. It was also stipulated that at the time of the search, defendant was not committing any offense. The State presented no evidence at the hearing. It argued that as there was no proof that the search was conducted without consent, the court should deny the motion because defendant had not sustained his burden of proving that the warrantless search was illegal. The trial court held that the defendant had not sustained his burden of proof and denied the motion.

■■ We agree with defendant that the trial court erred in so ruling. In *People v. Normant* (1st Dist. 1975), 25 Ill. App. 3d 536, 323 N.E.2d 553, we observed that the courts in Illinois have consistently held that once the defendant has made a *prima facie* case that the police lacked probable cause (*i.e.*, by evidence that the police had no warrant, and that defendant was doing nothing unusual at the time of his arrest), the burden of going forward with evidence to demonstrate the legal justification for the search shifts to the State. (25 Ill. App. 3d 536, 541.) In the case at bar, the stipulation established that the police had no warrant, that at the time of the search, defendant was in custody at the police station, and that he was doing nothing unusual at the time of his arrest. The burden of proving justification for the search thus shifted to the State. While the State indicated that it was able to produce a witness who would testify that the officers obtained consent to conduct the search, no such testimony was ever presented.

However, although the trial court erred in denying the motion to

suppress, the error does not warrant a reversal of defendant's conviction. It is clear that the admission of illegally obtained evidence in a criminal trial, following the erroneous denial of a motion to suppress, is subject to the harmless error rule of *Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824. (See *People v. Black* (1972), 52 Ill. 2d 544, 288 N.E.2d 376, *cert. denied* (1973), 411 U.S. 967, 36 L. Ed. 2d 689, 93 S. Ct. 2155, *rehearing denied* (1973), 412 U.S. 963, 37 L. Ed. 2d 1012, 93 S. Ct. 3015.) In *Black*, our supreme court stated:

> "In considering whether constitutional error constitutes harmless error beyond a reasonable doubt as required by *Chapman v. California*, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824, it is not enough that the erroneously admitted evidence be considered merely cumulative or that there be other evidence in the record sufficient to support the conviction. (*Fahy v. Connecticut*, 375 U.S. 85, 11 L. Ed. 2d 171, 84 S. Ct. 229; *Harrington v. California*, 395 U.S. 250, 23 L. Ed. 2d 284, 89 S. Ct. 1726.) The inquiry of a court of review should not be as to the amount of untainted evidence as compared to the amount of tainted evidence. The focus should rather be upon the character and quality of the illegally obtained evidence as it relates to the other evidence bearing on the same issue and the court should appraise the possible impact upon the jury of the wrongfully obtained evidence. *Schneble v. Florida*, 405 U.S. 427, 31 L. Ed. 2d 340, 92 S. Ct. 1056." (52 Ill. 2d 544, 555.)

See also *People v. Cole* (1973), 54 Ill. 2d 401, 404-06, 298 N.E.2d 705.

■■ Defendant argues that the t-shirt was the only piece of physical evidence connecting him to the murders and that in view of the fact that the four eyewitnesses all testified that defendant was wearing such a shirt, its admission into evidence could not reasonably be said to be harmless beyond a reasonable doubt. We disagree. We have examined the exhibit in question and the role it played in defendant's prosecution. There is nothing remarkable about this particular t-shirt. It is typical of thousands of such shirts. It bears no particular identifying characteristics. Defendant was not wearing this shirt (or any shirt) at the time of his arrest, nor at the time of the lineup from which he was positively identified by Hisson, Flynn, Radke, and Day. At trial, the issue sought to be proved by the admission of the shirt into evidence was the identity of the defendant as the shooter. Yet none of the four eyewitnesses who identified defendant testified that this was the same shirt worn by the defendant at the scene of the murders. Their testimony was only that it "looked like" the shirt. Their identifications of the defendant were in no way dependent on the shirt. They recognized him either because they knew him prior to September 1, 1971, or because they had an adequate opportunity to view him at the scene of the crime. Viewed from this perspective, the t-shirt, while

relevant to the issue of defendant's identity, possessed little probative value. Its admission into evidence was harmless error beyond a reasonable doubt. See *People v. White* (1st Dist. 1973), 16 Ill. App. 3d 419, 423-24, 306 N.E.2d 660; *People v. Griffin* (4th Dist. 1973), 16 Ill. App. 3d 355, 359, 306 N.E.2d 59.

## II.

Defendant contends that he was denied his constitutional rights to confront the witnesses against him and to compulsory process. Prior to trial, defendant caused to be issued subpoenas to the clerk and chief probation officer of the Juvenile Division of the circuit court, calling for the production of the juvenile court records of the State's four eyewitnesses. On the return date an assistant state's attorney representing the juvenile court authorities appeared with the subpoenaed documents[3] and moved to quash the subpoena based on sections 2—8(3) and 2—10 of the Juvenile Court Act[4] (Ill. Rev. Stat. 1971, ch. 37, pars. 702—8(3), 702—10) on grounds that none of the four had ever been found delinquent.

Following argument of counsel, the trial court granted the motion to quash, citing General Order 1—2.1 of the Circuit Court of Cook County, which provides that orders relating to matters under the Juvenile Court Act should be filed in the Juvenile Division.[5] The court concluded that it was without authority to release the records. However, because the Juvenile Court Act allows the State access to these files, the trial court

---

[3] The records supplied in response to the subpoena related only to Hisson and Day. Neither Hisson nor Day had ever been found delinquent within the meaning of the Juvenile Court Act (Ill. Rev. Stat. 1971, ch. 37, pars. 701—1 through 708—4). Neither Margie Flynn nor Albert Radke had juvenile records.

[4] Section 2—8(3) provided:
"(3) The records of law enforcement officers concerning all boys under 17 and all girls under 18 must be maintained separate from the records of arrests and may not be open to public inspection or their contents disclosed to the public except by order of the court or when the institution of criminal proceedings has been permitted under Section 2—7 or such a person has been convicted of a crime and is the subject of presentence investigation or proceedings on an application for probation."

Section 2—10 provided:
"§2—10. Impounding of Certain Files.) The official court file and other files containing any memorandum or report and any transcript of testimony in proceedings under this Act shall be impounded and shall not be made available to the general public but may be inspected by representatives of agencies, associations and news media or other properly interested persons by general or special order of court. The State's Attorney and the attorney for the minor shall at all times have the right to examine court files and records except as provided in Section 5—1."

[5] General Order 1—2.1 of the Circuit Court of Cook County provides, in relevant part:
"The Circuit Court of Cook County is composed of departments, divisions and districts as follows:
° ° ° ,
VI—Juvenile Division.
The Juvenile Division hears actions and proceedings arising under the Juvenile Court Act of 1965, as amended, ° ° °."

ruled that information of an impeaching nature contained within the files should be made available to the defendant under the rules of discovery. (Supreme Court Rules 411 through 415, Ill. Rev. Stat. 1971, ch. 110A, pars. 411 through 415.) The trial court then conducted an *in camera* inspection of the records and concluded that the only material contained therein potentially useful to the defense related to the witness Hisson. Accordingly, defense counsel was informed by the court of the names of four persons who were potential witnesses as to Hisson's reputation, if any, for truth and veracity.

Defendant's argument rests on *Davis v. Alaska* (1974), 415 U.S. 308, 39 L. Ed. 2d 347, 94 S. Ct. 1105, in which the United States Supreme Court held that the right of confrontation of witnesses requires that a defendant in a State criminal proceeding be allowed to impeach the credibility of a prosecution witness by cross-examination directed at possible bias deriving from the witness's probationary status as a juvenile delinquent. This would be so even if such impeachment would clash with the State's asserted interest in preserving the confidentiality of juvenile delinquency adjudications. Defendant also relies on *People v. Norwood* (1973), 54 Ill. 2d 253, 296 N.E.2d 852 (decided prior to *Davis v. Alaska*).

Defendant argues that if the juvenile court records revealed that Bobby Hisson was on probation, his testimony might have been motivated or affected by either his fears of probation revocation or promises of leniency, and that such information would have been highly relevant to his credibility. Defendant also argues that the information contained in the records was favorable to his case, that only his counsel is capable of making that determination, and that under *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194, and *Dennis v. United States* (1966), 384 U.S. 855, 16 L. Ed. 2d 973, 86 S. Ct. 1840, its disclosure is required.

In attempting to secure information from the juvenile court records, defendant had a choice of two courses of action. He could have filed a petition before the juvenile court and bear the burden of overcoming the limited privilege bestowed upon juvenile records by the Juvenile Court Act. Or, because the records are available to the prosecution, regardless of any privilege,[6] the defendant could move the trial court to exercise its discretion in the criminal case under the discovery rules.

In *Davis v. Alaska*, the witness whose juvenile court records were sought had previously been adjudged delinquent. At the time of Davis's trial, the witness was on probation. In addition, under the circumstances of the crime with which Davis was charged, it was arguable that the witness' testimony was intended to shift the blame to defendant to avoid possible revocation of his probation or his own possible prosecution for

---

[6] See section 2—10 of the Juvenile Court Act, note 4, *supra*.

the offense. The court stated: "*In this setting* we conclude that the right of confrontation is paramount to the State's policy of protecting a juvenile offender." (415 U.S. at 319.) (Emphasis added.) In *Norwood*, the court characterized the testimony of the witness whose juvenile records were sought as "critical" to the prosecution. The court added that: "*  *  * if his testimony was not believed the defendant could not have been convicted." (54 Ill. 2d at 255.) The facts of *Norwood* reveal that the witness was an accomplice to, or was at least accountable for, the same offense with which the defendant was charged. Our supreme court construed section 2—8(3) of the Juvenile Court Act as not prohibiting "access to the records of juvenile *delinquents* when those records are sought in order to impeach the credibility of the juvenile as a witness by showing a possible motive for testifying falsely."[7] (54 Ill. 2d at 257.) (Emphasis added.) But the court did not authorize unlimited disclosure of juvenile records. The court stated: "We hold, therefore, that the statute did not bar the disclosure of the juvenile records of the witness *insofar as they might be relevant to the defendant's claim that the witness's testimony was attributable to lenient treatment which he had received or had been promised.*" (54 Ill. 2d at 258.) (Emphasis added.)

None of these factors is present in the instant case. As the juvenile records in question were included in the record on appeal, we have examined them. They reveal that neither Hisson nor Day had ever been found delinquent by the juvenile court. Neither was on probation at the time of the murders or at the time of their testimony at trial. No suggestion has been raised by defendant, and none is supported by the record, that either witness may himself have committed the murders or might have been criminally accountable in any way, and was thus motivated to testify falsely in order to shift the blame from himself to defendant. In contrast to *Norwood*, the testimony of no single witness in this case was critical to defendant's conviction. The juvenile records of witnesses Hisson and Day contain nothing relevant to a charge that their testimony was attributable to lenient treatment which they had been promised or had received. In this setting defendant has not shown that his right to confrontation is paramount to the State's interest in protecting these juvenile witnesses. By conducting an *in camera* inspection of the records and disclosing to defendant the names of four potential witnesses, the trial court adequately protected defendant's right of confrontation.

Although the records are discoverable under our supreme court rules pertaining to discovery in criminal cases, the defendant does not have an unqualified right to examine the entire file, however. These documents are potentially discoverable under either parts (c) or (h) of Supreme

---

[7] For an excellent discussion on this topic, see *Annotation*, 63 A.L.R. 3d 1112 (1975).

Court Rule 412. (Ill. Rev. Stat. 1971, ch. 110A, par. 412.) Rule 412(c) provides:

> "(c) Except as is otherwise provided in these rules as to protective orders, the State shall disclose to defense counsel any material or information within its possession or control which tends to negate the guilt of the accused as to the offense charged or would tend to reduce his punishment therefor."

Rule 412(h) provides:

> "(h) Discretionary disclosures. Upon a showing of materiality to the preparation of the defense, and if the request is reasonable, the court in its discretion may require disclosure to defense counsel of relevant material and information not covered by this rule."

■■ A comparable factual setting was presented for our consideration in *People v. Nunez* (1st Dist. 1974), 24 Ill. App. 3d 163, 320 N.E.2d 462. There, defense counsel had moved for production of certain police records alleging that they contained evidence favorable to the accused and that they might corroborate the testimony of an important defense witness. The State admitted the material sought was in its possession but refused to allow defense counsel to inspect it. The trial court denied the motion without examining the materials. We vacated the judgment and held that under Rule 412, parts (c) and (h), defendant was entitled to have the trial court examine the disputed material to ascertain whether it contained information pertinent to the defense. (24 Ill. App. 3d 163, 171-72.) Thus, although parts (c) and (h) of Rule 412 do not specifically provide for an *in camera* inspection of potentially discoverable documents, as does part (a)(i) of the same rule, such a procedure is implicit. In the case at bar, the trial judge correctly employed such a procedure and disclosed all of the information contained within the files pertinent to the defense. Defendant suffered no prejudice by his inability to examine the entire contents of these files.

## III.

■■ Defendant next contends that he was denied his right to a fair trial when the State was allowed to ask certain questions on cross-examination of the defendant which he contends were beyond the scope of direct examination. Defendant argues that this error was compounded when the State was allowed to present highly prejudicial rebuttal testimony of a collateral criminal act alleged to have been committed by defendant on the day before the Leonard and Navarro murders.

On cross-examination, the assistant state's attorney led defendant through a series of questions in which he: denied owning or possessing a rifle on September 1, 1971, the date of the Leonard and Navarro murders; denied owning, possessing, or shooting a rifle during the month of August

1971, including the 31st of August; and testified that he had not fired a rifle since 1967 or 1968. Counsel for the defendant did not object to any of these questions.

On rebuttal, the State recalled Timothy Day to the stand. Day then related an incident alleged to have occurred on August 31, 1971, in which defendant had fired a rifle at Day and the decedent, Bobby Leonard. Defendant's motion for a mistrial was denied.

The State maintains that the cross-examination was within the scope of the direct examination. The State relies on the following question and answer from defendant's direct examination by his own counsel as the basis for its questions:

"Q. Did you shoot anybody?

A. No, never in my life."

By choosing to waive his privilege against self-incrimination and testify in his own behalf, defendant placed his credibility in issue in the same manner as any other witness. Defendant's testimony that he had never shot anyone in his life, if believed by the trier of fact, would preclude his conviction. It was important for the State, therefore, in order to sustain its burden of proof, to then present evidence, if such evidence existed, to contradict or discredit defendant's testimony. We stated in *People v. Watkins* (1st Dist. 1974), 23 Ill. App. 3d 1054, 320 N.E.2d 59:

> "The determination of the propriety of cross-examining a witness for the purpose of later contradicting his answers is dependent upon the relevancy of the cross-examination. (*People v. Kirkwood* (1959), 17 Ill. 2d 23, 160 N.E.2d 766, *cert. denied* (1960), 363 U.S. 847; *People v. Sisti* (1967), 87 Ill. App. 2d 107, 230 N.E.2d 500.) * * * Facts will be considered non-collateral, and hence open to impeachment, if one of two tests is satisfied: the facts are relevant to substantive issues in the case or are independently provable by extrinsic evidence, apart from the contradiction, to impeach or disqualify the witness." (23 Ill. App. 3d 1054, 1060.)

The questions asked of the defendant on cross-examination were not objected to by his trial counsel. The testimony presented on rebuttal was relevant to discredit his testimony on the most crucial fact at issue: his guilt of the offense charged.

*People v. Kirkwood* (1959), 17 Ill. 2d 23, 160 N.E.2d 766, and *People v. Simmons* (1916), 274 Ill. 528, 113 N.E. 887, relied upon by defendant, hold that it is improper to cross-examine a witness on irrelevant matters for the purpose of later contradicting his answers. We have no quarrel with this rule of law. However, both *Simmons* and *Kirkwood* are distinguishable. In both cases the evidence complained of was purely collateral and clearly beyond the scope of the direct examination.

Defendant also contends the evidence of the shooting on August 31,

1971, was inadmissible because it related the details of another crime alleged to have been committed by the defendant. Because we have concluded that the evidence was admissible to impeach defendant's credibility, we find no error on this point.

When considered in conjunction with the overwhelming evidence of defendant's guilt, absent the disputed evidence, we are satisfied defendant received a fair trial. See *People v. Stewart* (1st Dist. 1974), 24 Ill. App. 3d 605, 614, 321 N.E.2d 450; *People v. Mannen* (3d Dist. 1977), 46 Ill. App. 3d 61, 63-64, 360 N.E.2d 563, 565.

IV.

Defendant contends he was denied a fair trial because the trial court improperly restricted cross-examination of the State's witnesses. Defendant cites, in all, 14 such instances of alleged improper restriction. We have carefully reviewed the testimony relative to each of these points and are satisfied that no prejudicial error occurred.

V.

We have carefully reviewed the long record and arguments of counsel and conclude that there is no merit to the other contentions raised by the defendant in this appeal. Accordingly, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

STAMOS and PUSATERI, JJ., concur.